October 3d.

SOUVERBYE AND WIFE *against* ARDEN AND OTHERS.

Declarations of the intention, or understanding, of a grantor, different from the intent apparent on the face of a deed, or of conditions annexed to it, to be effectual, must be made at the time of executing it.

If, at the time of executing a deed, there was no delivery, or intention to deliver, these are facts which should be explicitly proved by the grantor. So, a mistake in drawing a deed must be clearly proved.

If a deed has been duly delivered in the first instance, the subsequent custody of it, by the grantor, will not destroy the effect of the delivery.

A deed may be delivered to a third person, as the servant, or bailee, of the grantee, and such delivery will be valid.

A voluntary settlement, fairly made, is always binding, in equity, upon the grantor, unless there be clear and decisive proof that he never parted, nor intended to part, with the possession of the deed ; and, if he retain it, there must be other circumstances beside the mere fact of his retaining it, to show that it was not intended to be absolute.

THE plaintiff, *Eliza Bouquet*, and her former husband, *Vital Antoine Servant Grangiac*, filed their bill against *James Arden*, *De Witt Clinton*, and *Richard D. Arden*, to compel a conveyance, to the plaintiffs, of a lot of land in the city of *New-York*, and, also, for an account.

The bill charged that the defendant, *James Arden*, and *Eliza*, his wife, the father and mother of the plaintiff, *Eliza Bouquet*, in the year 1804, conveyed to *De Witt Clinton* and *Richard D. Arden*, a certain house, warehouse, and lot of land, extending from *Greenwich-street* into *Washington-street*, in trust for the said *Eliza Bouquet* ; that the deed was duly acknowledged by the grantors, and at, or about, the time of the execution of it, delivered to the trustees. It was further stated, that *Eliza Arden* died about the 4th of *August*, 1806 ; and that *Eliza Bouquet*, on or about the 26th of *January*, 1809, married with *Grangiac* ; and that the trustees had paid to *James Arden*, or permitted him to receive, the rents and profits of the trust estate, of which they refused to render the plaintiffs an account, or to pay

them what was due thereon, or to let them into possession of the estate, and the receipt of the rents and profits.

The defendants each put in a separate answer.

*James Arden* stated, that on or about the 25th of *No-vember*, 1809, he was seised in fee of and in a certain mes-suage and tenements, and that he, and his wife, *Eliza*, being minded to make some provision for their daughter, the plain-tiff, came to a resolution to execute a deed, or conveyance, for the said messuage and tenements, in such a way that the same should not, after his decease, vest in her absolutely; so as to be at her disposal, but that the same should go to her children, if she had any living at her decease, and, if not, return to his family. He further stated, that it was not then, nor ever was, his intention, or design, to part with the possession of the said lots, or to give up the rents and profits thereof, nor to vest the estate in such a manner as that it should go to the plaintiff, *Eliza Bouquet*, even after his decease, in case she married against, or without, his con-sent or approbation. The defendant applied to a counsellor at law, to draw a deed conformable to this his intention, which he supposed was drawn accordingly. The deed was upon the following trusts; that is to say, upon trust and con-fidence, that *Eliza Bouquet* should stand and be seised of the premises thereby granted, for, and during her natural life; in further trust and confidence, that in case *Eliza Bouquet* should die, leaving lawful issue, that then the trus-tees, *Richard D. Arden* and *De Witt Clinton*, should stand and be seised of the premises in trust, for such child, or children, of the body of *Eliza Bouquet*, lawfully to be be-gotten, in fee simple ; and for want of such children, then in trust for all, and every the person, or persons, their heirs and assigns, for ever, as should be entitled to the same by the laws of the state of *New-York*, in case he, the said *James Arden*, had died intestate, and the deed had never been made. The deed was executed in the presence of two witnesses, and the defendant says, that he thinks it pro-

1814.

SOUVERBYE
v.
ARDEN.

bable, and believes, that he and his wife may have used the formal words of delivering the deed; but that neither of the trustees of *Eliza Bouquet* were present at the execution of it, and that it was not acknowledged by him, or his wife, before an officer authorized to take the acknowledgment thereof. The deed remained in the possession of the defendant until about the 6th of *January*, 1809, when, it being expressed to him that his daughter, and her sister, for whom he had made a similar provision, entertained some apprehension that the deed, in case of his death, might be lost, or destroyed, he consented to place the same in the hands of *De Witt Clinton*, for their benefit; that he accordingly delivered this deed, with another deed, intended for the benefit of his other daughter, to *Clinton;* and, at the time of the delivery, stated to him, in the presence of his present wife, and both his daughters, that it was to be explicitly understood that the income of the property should enure to him during his life; and that if either of his daughters should marry without his consent, or approbation, that the deed, intended for her benefit, should not operate, or be of use, or to that effect, according to his best recollection and belief; and these expressions, he supposed, were sufficient to create a conditional delivery of the deed, to take effect only after his decease. The defendant further stated, that the yearly value of the estate was about 1,500 dollars, which he had received, ever since the date of the deed, to his own use, paying taxes, &c., causing the premises to be insured, and paying the premium of insurance.

*Richard D. Arden*, in his answer, does not profess to state any thing from his personal knowledge; but as far as his answer goes, it is in confirmation of that of *James Arden*.

*De Witt Clinton*, in his answer, stated, that on or about the 6th of *January*, 1809, he, at the request of the defendant, *James Arden*, went to his house, and when there, *Arden* informed him, that he had requested him to call, with a view

of depositing in his hands two several deeds, for the benefit of his daughters, *Louisa and Eliza;* and that, thereupon, *Arden,* in the presence of his wife and daughters, delivered to him two deeds, one for each of his daughters; the deeds were enclosed in one envelope, which was labelled, or endorsed, as follows : " Two deeds, viz. one to *Louisa Ann Arden,* and one to *Eliza Bouquet Arden,* each for one lot of ground in *Greenwich-street,* through to *Washington-street,* to *Richard D. Arden* and *De Witt Clinton,* Esqrs., in trust, 1805." Immediately before, or at the time of the delivery, *Arden* stated, in the presence of his wife and daughters, that the property intended for each of his daughters was worth upwards of 21,000 dollars, and that the annual rent was 1,500 dollars; and that he wished it to be explicitly understood, that the income of the property should enure to him, during his life; and that if either of his daughters should marry without his approbation, that the deed intended for her benefit should not operate. Both the daughters acquiesced in the declaration, or arrangement, that the rents of the property should enure to *James Arden* during his life; but neither of them acquiesced in the declaration, or arrangement, that, if either of them should marry without his approbation, the deed intended for her benefit should not operate. There was no certificate of acknowledgment upon the deed. The defendant denied that any application had been made to him, by the plaintiffs, relative to the property, or the rents and profits, or to an account thereof, or the *receipt and application thereof;* and stated, that shortly after the marriage of the plaintiff, *Eliza Bouquet,* with *Grangiac,* the defendant, *James Arden,* requested him to deliver up the deed to him, and offered to indemnify him from any pecuniary loss in consequence thereof; but this he refused to do.

After the cause was at issue, *Grangiac* died, and it was then continued in the name of *Eliza Bouquet,* the surviving

1814.  plaintiff, and after her marriage with the plaintiff, *Sou-*
*verbye*, in their joint names.

SOUVERBYE
v.
ARDEN.

It appeared from the evidence, that the deed in question, together with one for the benefit of *Loiusa Ann Arden*, (afterwards *Sterry*,) was executed on the 25th of *December*, 1805, in the bed room of *Eliza Arden*, who was then confined by sickness; and it is expressly stated, by several witnesses, that *Eliza Bouquet* and her sister *Louisa* were present. The plaintiff, *Eliza Bouquet*, married *Grangiac* on the 22d of *January*, 1809, and it was the general opinion of the witnesses, from the notoriety of the subject in the family, that he knew of the settlement which had been made by *Arden* on his daughter.

*Alexander Bleecker*, who was one of the subscribing witnesses to the two deeds, (*A. J. Hamilton*, who was examined, was the other,) stated, that he did not remember reading, or hearing them read, and that they were not put into the hands of the plaintiff, and *Louisa*, but that they were taken by *James Arden*, and that he did not know what became of them afterwards. He, however, said, that his recollection was faint as to the circumstances attending the execution; and *Agnes D. Braine*, who was also present, said, that *James Arden* read the two deeds aloud in succession, and after they were executed, gave them to *Eliza Arden*, his wife.

*Louisa Ann Sterry* testified, that *Eliza Arden*, her mother, previously to her death, used frequently to express a very anxious wish to her father, *James Arden*, that he would execute deeds making a settlement on the plaintiff and witness, and often urged him to have the two deeds in question signed, and that when the same was done, her mother expressed very great satisfaction on the subject, and said that she was very happy that they were thus handsomely provided for. The witness further testified, that at the time when the deeds were executed, *James Arden* handed to the witness, and her sister, the plaintiff, their respective deeds, which they laid upon the ledge of a case or wardrobe standing in the room.

The witness soon after took and locked up her own deed in her own bureau, but the plaintiff's deed remained in the same place until after the death of her mother; while it remained there, her father used to come into the room, which the witness and her sister occupied as their bed room, to get papers which he kept locked up in the lower part of the case or wardrobe, and upon seeing the plaintiff's deed lying upon the ledge, he observed, that it was careless to leave it so exposed, whereupon the plaintiff soon afterwards locked it up. The witness stated, that she delivered her deed to her father for safe keeping, and supposed that her sister, the plaintiff, had done the same, or that it was taken by her consent for that purpose. The witness further stated, that at the time the deeds were delivered to *Clinton*, her father said that she and the plaintiff must marry with his consent, and that she, the witness, immediately replied, " *Oh no, I will not agree to that*," or words to that effect, and supposed that her father did not speak seriously. The witness said, that neither she nor her sister supposed that the property would be forfeited by their marrying without their father's consent.

*Agnes D. Braine*, a witness before mentioned, testified, that, when the deeds were executed, *Arden* gave them both to his wife; but the witness, after the death of Mrs. *Arden*, frequently saw the deeds lying on the ledge of the case before mentioned, in the bed room of the plaintiff, *Eliza Bouquet*, and her sister *Louisa*, and was present when they compared their deeds together, *Louisa* reading aloud her deed, and the plaintiff and witness at the same time looking over the other ; they then laid down the deeds carelessly in the same place. The witness further stated, that, afterwards, while the witness was sitting with the plaintiff and her sister in the same room, *James Arden* came into the room, and took some papers out of the lower part of the case, and seeing the deeds in question lying as before mentioned, said, " *girls, how can you be so careless with your deeds ?*" to which *Louisa* answered, that they were safe enough

1814.

SOUVERBYE
v.
ARDEN.

there, when he replied, "*if you do not know how to take care of them, I will do it for you,*" or words to that import, and *Louisa* replied, "*so do,*" or "*so you may,*" or words to that effect, whereupon *Arden* took them out of the room, but what became of them afterwards the witness did not know. The witness also testified, that one day afterwards, the plaintiff observed to her father, that she was fearful he had given the deeds to *Richard Arden,* (one of the defendants,) and that if he had, *Richard* was not too good to burn them. *Arden* said he was surprised she should imagine any such thing; that *Richard* had not got the deeds; whereupon *Louisa* expressed a wish that he would put them into the hands of *De Witt Clinton* to keep, to which he replied, that he would do so, if that would make her content.

*Elizabeth Talbot* testified, that before the death of *Eliza Arden,* the witness visited her in her bed room, when she pointed to some papers on the desk or secretary, as being the deeds to her daughters, which the witness took up, and looked at what was written on the back of them, but does not now recollect what it was.

*Richard D. Arden* was examined as a witness on the behalf of *James Arden,* under an order of the court, and stated, that he saw the deeds shortly after the execution of them, and before the death of *Eliza Arden,* in the before-mentioned case or secretary, where he understood, and believes, they were left by *James Arden* at the time; that the case consisted of an upper and lower part, the upper part being something like a clothes' press, or wardrobe, and the lower part consist d of drawers, the upper one of which being drawn out, and the front part let down by means of a spring, formed a secretary or place for writing, and keeping papers; that it was in the secretary part that he saw the deeds both before and after the death of his mother; that the keys of both parts of the case had been left with the plaintiff, and her sister *Louisa,* after the death of their mother, by her request, and that they being in possession of

the keys, had access to the deeds, and might have taken them into their hands while they remained in the room, but that neither of them had possession of them other than as a clerk might be said to have possession of papers, which were accessible to him by means of their being open or exposed in the office or house where he should be employed. *James Arden*, afterwards, took the deeds from the bed room, and deposited them in his desk, in his office, being the same place where they were kept after they were drawn, and before they were signed.

*De Witt Clinton* was also examined under an order of the court, in behalf of the defendant, *James Arden*, but his deposition was, in effect, the same as his answer, and, therefore, is not necessary to be stated.

A considerable part of the evidence consisted of the declarations of *James Arden*, and *Eliza*, his wife, as to the intent with which the deeds were executed, and was also intended to prove that his daughters knew of, and acquiesced in the conditions.

*S. Jones*, jun., for the plaintiff. 1. The deed was duly delivered to the plaintiff, at the time its execution was witnessed. A deed may be duly executed, though the grantor takes it back into his custody; the title passes, and the deed cannot be avoided, but by matters subsequent. (13 *Vin. Ab.* (K) 22—(L) 24. pl. 3. *Cro. Eliz.* 7. *Shelton's case.*)

2. The delivery to *Clinton* was absolute in law. There can be no conditional delivery of a deed, except as an *escrow*. Now, it could not be an *escrow*, for it was a delivery to the party herself, that is, to her *trustee*, for her. (*Noy's Rep.* 6. *Hobart*, 246. 9 *Co.* 137.) Again, why execute the deed, if he did not mean to deliver it?

3. There is not sufficient evidence of a parol agreement at the time; and if it was made out with sufficient certainty, it was void. The conditions relied on were not made at the

SOUVERBYE
v.
ARDEN

time of the first execution of the deed ; these conditions were after thoughts of the grantor. The nature of the deed is attempted to be altered and qualified by *parol* proof, which is clearly against every principle of law. The deed is absolute on the face of it; as a bargain and sale, it operates by way of *use.* Such a reservation, if contained in the deed, would have made it void. The subsequent agreement is a parol reservation of a life estate. A person may, by will, transfer the fee after his death, but he cannot do it by deed, unless there is some previous estate. The condition is repugnant to the grant, and must avoid it. (2 *And.* 64. *Popham,* 49. *Moore,* 687. *Cro. Eliz.* 344. *Siderf.* 32.) If the grantor had died, after the delivery to *Clinton,* and before the marriage of his daughter, it would have been a valid deed. The subsequent condition depended on the will of the grantor solely. It was a power of revocation, at his pleasure, and resting in parol. Again, this agreement, or condition, was void by the statute of frauds. (1 *H. Bl.* 289. 3 *Wils.* 275. *Cowp.* 47. 1 *Vesey,* 317. 3 *Bro.* 168. *Str.* 1261. *Bl. Rep.* 1249. 4 *Bro.* 514. 5 *Ven. Contract,* (G) pl. 26.)

To allow a solemn deed to be defeated by parol proof of a subsequent condition, would be of dangerous consequence. (2 *Atk.* 383. 1 *Vesey,* jun. 241. *Sugd. Law of Vend.* 88, 89, 90.)

The defendant cannot, by his *answer,* correct a mistake in his deed. If he could show a mistake, and wished it to be corrected, he should have filed his bill for that purpose. Again, a delivery to a *cestuy que trust,* is a good delivery of a deed. (*Jenk. Cent.* 195, pl. 2. 13 *Vin. Ab.* 22. pl. 12.)

A deed of bargain and sale operating by way of *use,* the use must be in the grantee ; for a use in the bargainee will not feed a use to the bargainor; though deeds which operate by way of transmutation of possession may admit of a different doctrine. (*Jackson* v. *Myers,* 3 *Johns.*

*Rep.* 388.   *Sanders on Uses*, 129.   *Dyer*, 155. *a.*   1 *Co.* 136. *b.* 137. *a.*)

There is no provision, in this case, for the estate going over, in case the condition was not performed.

*Harison*, and *Harris*, contra, contended, 1. That there was no delivery of the deed, at the time of its execution, in 1805. The answer, which is equivalent to the oaths of two witnesses, denied the delivery. The intention of the grantor, to annex the condition to the delivery, was manifest; and a deed may be delivered on conditions. The statute of frauds does not apply to such a case.

The only delivery, if any, was in 1809, to Mr. *Clinton;* and the condition of that delivery is fully proved. The defendants being called on to account, and acting defensively, may give parol evidence. (14 *Vesey*, 519. 7 *Vesey*, 219. 6 *Vesey*, 332, 333, 334. 1 *Vesey*, 456.) Though the rule might be otherwise, if the defendant was seeking an execution of the agreement. (4 *Vesey*, jun. 519. 2 *Vesey*, 219.)

There was no ground of equity on which this court can interfere to help the plaintiffs, at least, during the lifetime of the father. No rents were due at the time the bill was filed, and none ever came to the hands of either of the trustees. They were competent witnesses, being made defendants for form sake only. *Clinton* fully proves that the condition of the delivery to him, that *Arden* was to have the rents and profits during his life, was fully assented to by the daughters. The very fact of this delivery, in 1809, is evidence that the deed had not been delivered before. In the case of *Villers* v. *Beaumont*, (1 *Vern.* 100.,) the party was not to have possession during life. The cases of voluntary settlements are those in which they were to take place after death.

Where a deed is deposited with a trustee, in trust, to receive the rents and profits during his *life*, there is no case

1814.

SOUVERBYE
v.
ARDEN.

where a court of equity will force a trustee to account, contrary to the terms of the trust.

Though, at law, the delivery would take effect, free from these conditions, yet, in equity, it will be otherwise, and the trustee will be considered like a third person at law, in the case of an escrow, and the terms of the delivery of the deed be supported. Where a party comes into equity, to compel a trustee to perform, the court will look at the intent, and not compel a trustee to act against the intent of the parties. The *defendants* may show the intent, as to the conditions, in *equity;* and so far, as ground of equitable relief, they may show the mistake, in not inserting the conditions in the deed, agreeably to the instructions given to the counsel for that purpose. The real sense and meaning of the parties must prevail here, and the court will not deprive the grantor of the rents and profits during his life, contrary to that intent. A consideration of one dollar will make a resulting trust enure to the grantor, in a deed of bargain and sale.

This court may, in its discretion, relieve against a voluntary deed. (*Prec. in Ch.* 84.)

*Riggs*, in reply, insisted, that the sealing and formal execution of the deed, was the perfection of the act; and the burden of proof lay on the grantor to show, clearly, that there was no delivery, at the time, contrary to the face of the deed. (*Wheelwright* v. *Wheelwright*, 2 *Tyng's Mass. Rep.* 447.)

*Arden*, in his answer, did not pretend that there was any explanation given to the witnesses, at the time of the execution of the deed, of any terms or conditions different from what appeared in the deed itself. If any such conditions were intended, it was the duty of the grantor to explain them to the witnesses *at the time.* The evidence of the two subscribing witnesses, is strong and conclusive as to the solemn execution and delivery of the deed, without any terms,

or explanation of the grantor, being declared or expressed. The mother of the grantee died in *August*, 1806, and until that time, the deed was in a drawer, under the power and control, if not in the actual custody, of the grantee.

The parol evidence was inadmissible ; it was against the statute of frauds. A *trust* cannot be created by parol.

THE CHANCELLOR. Several points have been raised respecting the deed mentioned in the pleadings.

1. It is contended, on the part of the plaintiffs, that the deed was perfected by the sealing and delivery, on the 25th of *December*, 1805, and that the estate then passed and vested in the grantees, for the uses and purposes therein declared.

In my opinion, this allegation is fully and effectually supported by the proof.

The answer of the grantor, to this point, is, " that he and his wife signed, and, as he believes, sealed the deed, at or about the time it bears date, in the presence of two witnesses ; and he thinks it probable, and believes, that he and his wife may have used the formal words of delivery." He says, further, that he had applied to *Abraham Skinner* to draw the deed, so as not to part with the possession and profits of the lot during his life, and so as that the same should never vest in the plaintiff, his daughter, if she should marry without his consent and approbation ; that he supposed the deed was so drawn ; and that it remained in his possession and power from the time it was so signed and sealed, until the delivery to Mr. *Clinton*, in *January*, 1809.

The first reflection that arises upon this answer is, that it does not aver or pretend that any explanation was given to the witnesses, or to the plaintiff, or others, at the time of the execution of the deed, of the understanding or intentions of the grantor, at to its operation.

It was his duty to have spoken then, and to have declared his intention, if he had any, inconsistent with the natural

and necessary result of that solemnity. The general princi- ple of law is, that the formal act of signing, sealing, and de- livery, is the perfection and consummation of the deed, and it lays with the grantor to prove clearly that the appearances were not consistent with the truth. The presumption is against him, and the task is upon him to destroy that pre- sumption, by clear and positive proof, that there was no de- livery, and that it was so understood at the time. If he understood, or supposed, that the deed was drawn conforma- bly to his views, (as he asserts,) there was no need of any check to a complete and valid delivery, and he must have intended such delivery, as the deed would always have car- ried within itself the evidence of his intentions. I should conclude, therefore, from the answer alone, that there was a delivery of the deed, in judgment of law, in *December*, 1805. If there was a mistake in the drawing of the deed, the defendant had not undertaken to show it. He has not examined *Skinner*, who drew the deed, and he does not say that he had not perused the deed before he signed it. The presumption is irresistible that he must have known of its contents, and being of competent capacity to do business, he is justly chargeable with that knowledge. The mistake must be clearly and strongly proved, before the court can correct a deed or writing. (1 *Ves.* 317.  3 *Bro.* 454.  6 *Ves.* 333, 334.)

The evidence of the execution of the deed consists of the testimony of four persons who were present, and three of whom were subscribing witnesses. *Bleecker* and *Hamilton* attest to the execution of the deed in the usual way, and that they subscribed to it as witnesses. There was no condition, qualification, or explanation made. It was on a *Christmas* day, in the bed room of Mrs. *Arden*, where she was confined by sick- ness: *Bleecker* says he understood the purport of the deed, though his recollection is faint as to the circumstances re- specting the execution, and he does not remember reading, or hearing it read. Mrs. *Braine* was also present, and saw

the deed executed; and she recollects that the grantor read the deed aloud at the time. Mrs. *Sterry* was also present, and saw the deed executed, and heard the company congratulate her and her sister on the present of the deed ; and Mrs. *Arden* also expressed great satisfaction.

These are all the witnesses who were present at the execution of the deed, who have been examined in the cause ; and as there was no explanation given, or conditions annexed, contrary to the natural and legal import of the deed, the proof of the due execution of it, so as to pass the estate, must be deemed to be full and absolute. If an act, so authentic, can be impaired by mental reservations, at the time, or by subsequent loose and idle conversations, there would be no safety in ordinary transactions, and no certainty in legal solemnities.

There has been a good deal of examination and inquiry as to the custody of the deed from the time of its execution, until the actual delivery of it to *Clinton*, in 1809. This inquiry does not appear to me to be very important ; for, whatever may have been the fact, as to the custody of it from 1805 to 1809, it cannot affect the operation of the deed, provided it was duly delivered in the first instance, so as to become valid in law. But these inquiries into the subsequent history of the deed, tend rather to confirm than weaken the direct and positive proof of the first and absolute delivery.

We have seen that the defendant alleges, in his answer, that the deed continued in his possession and power. One of the subscribing witnesses (*Bleecker*) says, that, to the best of his recollection, the deed was not put into the hands of the grantee, but was taken by the grantor. Mrs. *Braine* says, that it was delivered, by the defendant, to his wife. This fact is perfectly consistent with *Bleecker*'s recollection. Mrs. *Sterry* says the deed was handed by the defendant to her sister, the plaintiff, and laid by her on the ledge, or projection of the case, or wardrobe, in the room ; and she proves that it remained in that open place until after Mrs.

*Arden's* death, which was in *August*, 1806. That the de-
fendant frequently came into the room for papers, which he
kept locked up in the lower part of the case, and once made
mention of the careless situation of the deed. Mrs. *Braine*,
who spent a considerable part of her time at the house of the
defendant, the summer after Mrs. *Arden's* death, proves
the same fact about the situation of the deed, and the censure
of the defendant upon such carelessness. Mrs. *Talbot*
mentions a circumstance attending a conversation with Mrs:
*Arden*, the summer she died, which corroborates the testi-
mony of the other two witnesses as to the manner in which
the deed was kept.

The testimony on the part of the defendant (*J. Arden*)
is not in contradiction with the above history of the deed:
*Richard D. Arden* saw the deed before the death of his
mother, in the case or secretary in her bed room, and he
says, that the plaintiff and her sister had the keys of the
room after their mother's death, and at her request, and that
the deeds remained for a considerable time in the bed room,
after his mother's death, when the defendant took both the
deeds, and put them in *his desk in his office below*, where
*they had been after they were drawn, and before they were
signed.* Mr. *Clinton* states, in his answer, that when the
defendant, (*J. Arden*) delivered the deeds to him, they
were enclosed in one envelope, and endorsed, " Two deeds,
viz. one to *Louisa*, and one to *Eliza B. Arden*, each for
one lot, &c., to *Richard D. Arden* and *De Witt Clinton*,
in trust, 1805."

The conclusion, from all this testimony, is, that the grantor
had not the custody and possession of the deed, until some
time after the death of the mother of the plaintiff; but that
the deed was in the actual possession of the plaintiff, or of her
mother, as her agent and bailee. I am perfectly satisfied
of the truth of this conclusion.

If we recur to the adjudged cases, and to the acknow-
ledged rules of law on this subject, they will be found in

favour of the valid operation of this deed, whether the actual delivery was to the plaintiff or to her mother. This is much stronger, and attended with more circumstances of a due delivery, than *Shelton's* case. (*Cro. Eliz.* 7.) In that case, the deed was sealed in the presence of the grantee and others, and was read, but not delivered; nor did the grantee take it, but it was left behind in the same place ; and yet, in the opinion of all the justices, it was a good grant, for the parties came together for that purpose, and performed all that was requisite for perfecting it, except an actual delivery; being left behind, and not countermanded, it was held to be a delivery in law. In the ancient authorities, and at a time when the execution of deeds was subjected to great technical formality and strictness, it was admitted, that if *A.* execute a deed to *B.*, and deliver it to *C.*, though he does not say to the use of *B.*, yet it is a good delivery to *B.*, if he accepts of it, and it shall be intended that *C.* took the deed for him as his servant. (*Paston*, J., *Year Book*, 3 *H.* 6. 27. *A.* and *Anon*, cited in 13 *Viner*, 23. *K.* pl. 12. *A.*) The case of *Taw* v. *Bury*, (2 *Dy.* 167. *b.*) is a strong determination on this point : *A.* delivered a deed to *B.*, to deliver over to *C.*, as his deed ; *B.*, did so, and *C.* refused to accept the deed, and it was, accordingly, left with him by *B.* It was held to be the deed of *A.*, and enuring to the benefit of *C.*, by the first delivery, and before any actual delivery over to the party ; and that the subsequent refusal of the party could not undo it as a deed from the beginning. To the same purpose is *Alford* and *Lea's* case, in 2 *Leon.* 110.

It is not to be understood that mere formal words of delivery will, in all cases, bind the party, and render the deed absolute. If it be declared, or agreed, at the time of execution, that the deeds is not to pass out of the possession of the grantor, until certain conditions are complied with, the deed will not operate until certain conditions are fulfilled. This has been so ruled at law, in the cases of *Jackson* v. *Dunlap*, and of the *Derby Canal Company* v. *Wilmot*, (1 *Johns.*

1814.

SOUVERBYE
v.
ARDEN.

1814.

SOUVERBYE
v.
ARDEN.

*Cas.* 114. 9 *East*, 360.,) and there is much good sense and equity in the decision. But if there be no such agreement or intention made known at the time, and both parties are present, and the usual formalities of execution take place, and the contract is, to all appearance, consummated, and the deed is left in the power of the grantee, or in the custody of his particular friend, without special instructions, there is no case to be found in law or equity, in which such a delivery is not held binding.

A voluntary settlement, fairly made, is always binding in equity upon the grantor, unless there be clear and decisive proof, that he never parted, nor intended to part, with the possession of the deed ; and even if he retains it, the weight of authority is decidedly in favour of its validity, unless there be other circumstances, beside the mere fact of his retaining it, to show it was not intended to be absolute: This will appear from an examination of a few of the strongest cases on each side of the question.

In *Naldred* v. *Gilham*, (1 P. *Wms.* 577.,) the aunt made a voluntary settlement upon her nephew, then an infant of only four years old, and both parts of the deed were kept in her own possession, and, some years afterwards, she made a different settlement on another nephew. The circumstances attending the execution of the deed do not appear, but Lord *Macclesfield* refused to establish the first settlement, and concluded, not only from the fact of her keeping the custody of both parts of the deed, *but from several other circumstances*, that it was a case of surprise and imposition in making the first settlement absolute without power of revocation; and in a case which I shall presently mention, Lord *Hardwicke* said, that this decision was not applicable to every case, but was dependent upon particular circumstances. In *Cotton* v. *King*, (2 P. *Wms.* 358.,) the mother made a voluntary settlement, in trust for her children, and delivered the duplicate deeds into the hands of her attorney and agent, " with a strict charge that he should not part with them;" and no

other person was privy to the transaction, and Lord Chan-
*King* held the settlement not binding.    Again, in *Ward* v.
*Lant*, (*Prec. in Ch.* 182.,) the father executed a voluntary
bond to his daughter, without any  condition, and payable
immediately ; but he  always kept it by him, and it was
proved to have been  his intention that no use should be
made of it, and that it was  only  to  protect him from taxes,
and it was, accordingly, set aside.

It is  easy  to  perceive  that there is  no analogy between
these  cases and  the present ; and yet they are, perhaps, as
strong as any to  be met with in favour of the failure of the
settlement.   There are other cases which show, affirmatively,
that the mere retention of the deed  by the grantor, is not
sufficient to defeat it.

In *Clavering* v. *Clavering*, (2 *Vern.* 473.,) a voluntary
deed of settlement, in trust, made in 1684, always kept by
the grantor in his custody,  and  never  published, and
found, after his death, among his papers, was held to control
a subsequent settlement, in 1690.   The Lord Keeper said,
that though the first settlement was always in the grantor's
custody, *that* did not give him a power to resume the estate ;
and he  referred  to  Lady *Hudson's* case, where a father,
having taken displeasure at his son, made an additional join-
ture on his wife, but  kept it in his  power ; and being after-
wards reconciled to his son, cancelled the additional jointure,
and died ; and his wife was allowed, after his death, to re-
cover on the cancelled deed.    The decree of the Lord
Keeper was, afterwards, affirmed in the house of lords.    (1
*Bro. P. C.* 122.)    The decision in *Boughton* v. *Boughton*,
(1 *Atk.* 625.,) was to the same effect, and Lord *Hardwicke*
made it, with the case of *Naldred* v. *Gilham* full in his
mind.    He held, that a voluntary deed, formal as to its exe-
cution, and without a power of revocation, and kept by the
grantor uncancelled, was not to be defeated by a subsequent
will.    He went still further, in the case of *Johnson* v. *Smith*,
(1 *Ves.* 314.)    The father, in that case, assigned all his

1814.

SOUVERBYE
v.
ARDEN.

bonds, and other securities, to his natural daughter; but the deed was never delivered to her, but put, by him, among his own writings, and he continued to deal with the securities as his own. He afterwards executed a bond to the daughter; and the Chancellor, after his death, put her to her election, between the deed of assignment and the bond.

I am accordingly of opinion, that the deed in question was duly executed, in *December*, 1805, so as to pass the estate; and that it was not, and could not be, defeated by any subsequent acts or declarations of the grantor. A voluntary settlement, without power of revocation, cannot be revoked. (*Villers* v. *Beaumont*, 1 *Vern.* 100. *Bale* v. *Newton*, 1 *Vern.* 464.) It becomes, then, unnecessary to examine and decide on the force and effect of such a delivery as that made to *Clinton*, in 1809. If a deed be duly executed, in the first instance, so as to take effect, any subsequent delivery is null and void. (*Co. Lit.* 48. *b.*)

The plaintiffs ought to be let into the possession, and the defendant, *James Arden*, to account for the rents and profits, from the time of the marriage of the plaintiff with *Servant*, the 22d of *January*, 1809, when she ceased to be supported in the family of the defendant; and let a reference be made to a master for that purpose; and all other questions are, in the mean time, reserved.

The following decree was thereupon entered:

" That the deed of conveyance from the defendant, *James Arden*, and *Eliza*, his then wife, to the defendants, *De Witt Clinton* and *Richard D. Arden*, bearing date the 25th of *November*, 1805, mentioned and set forth in the pleadings and proofs in this cause, was duly executed and delivered by *James Arden*, and *Eliza*, his then wife, on the 25th of *December*, 1805, so as to pass the estate and interest in the messuage and premises therein described, to the defendants, *De Witt Clinton* and *Richard D. Arden*, and to vest the same in them, to the uses, and upon the trusts, therein

mentioned ; and the deed of conveyance is hereby declared valid and effectual, in the law, accordingly.   And it is further ordered, adjudged, and decreed, that the plaintiffs, *Saint Martin Souverbye*, and *Eliza Bouquet*, his wife, in right of *Eliza Bouquet*, be forthwith let into the possession of the premises mentioned and described in the deed of conveyance from the defendants, *James Arden*, and *Eliza*, his then wife, to the defendants, *De Witt Clinton* and *Richard D. Arden*, bearing date the 25th of *November*, 1805, and into the perception of the rents and profits thereof, in arrear, and unpaid, and hereafter to accrue and become payable, or that *De Witt Clinton* and *Richard D. Arden* be immediately let into the possession thereof, as trustees, upon the trusts, and to the uses, in the deed expressed and declared, of and concerning the same.   And in case *De Witt Clinton* and *Richard D. Arden*, or the survivor of them, shall take possession of the premises, they, or the survivor of them, shall receive and take the rents and profits thereof, in arrear and unpaid, and which shall hereafter accrue, and become payable, in trust for, and pay over the same, from time to time, to *Saint Martin Souverbye*, and *Eliza Bouquet*, his wife, in right of *Eliza Bouquet*, during their joint lives, and to *Eliza Bouquet*, during her life, if she shall survive *Saint Martin Souverbye*, her husband ; or they, *De Witt Clinton* and *Richard D. Arden*, and the survivor of them, shall permit *Saint Martin Souverbye*, and *Eliza Bouquet*, his wife, in right of *Eliza Bouquet*, to take the rents and profits during their joint lives ; and that *Eliza Bouquet* is to take the same, during her life, if she shall survive her husband ; and after the death of *Eliza Bouquet*, one of the plaintiffs, the rents and profits of the premises shall be received, paid, and applied, according to the uses and trusts in the before-mentioned deed of conveyance, bearing date the 25th of *November*, 1805, limited and declared.   And that the trustees, or the survivor of them, and any other person then claiming an interest therein, un-

1814.

SOUVERBYE
v.
ARDEN.

1814.

SOUVERBYE
v.
ARDEN.

der the deed of conveyance, shall be at liberty to apply to this court, for its direction in that behalf. And it is further ordered, adjudged, and decreed, that the defendants, *De Witt Clinton* and *Richard D. Arden*, shall, within twenty days after notice of this decree, cause the deed of conveyance to be acknowledged, or proved, and recorded, according to law, for the greater safety of the title of the plaintiffs in this cause to the premises therein contained, and all others who may become interested therein. And it is further ordered, adjudged, and decreed, that the plaintiffs, during their joint lives, and *Eliza Bouquet*, after the death of *Saint Martin Souverbye*, her husband, if she shall survive him, shall be at liberty to use the names of the trustees, or the survivor of them, and to have the use of the deed of conveyance, for the purpose of prosecuting at law, or taking any reasonable measures to obtain the possession of the premises, and for receiving the rents and profits thereof, according to their, and her rights to the same, as hereinbefore declared and adjudged. And it is further ordered, adjudged, and decreed, that the defendant, *James Arden*, account with the plaintiffs in this cause, for the rents and profits of the premises, from the 23d of *January*, 1809, and that it be referred to one of the masters in chancery to take the account accordingly ; and that, in taking the account, the master charge *James Arden* with the rents of the premises received, or which, without wilful default, might have been received for the same ; and that the master make all just allowances to *James Arden*, for taxes and repairs ; and that the master who shall take the account, report thereon, to the court, with all convenient speed. And it is further ordered, that the question of costs, and all further directions, be reserved until the report shall come in."