## BISARD *v*. SPARKS.

DEEDS—DELIVERY—RETENTION BY GRANTOR.

Where a deed executed to an infant was retained by the grantor in his own possession and control until his death, with the exception of a brief interval, when it was handed to the father of the infant to be read, he being instructed at the time to have it recorded if anything should happen to the grantor, there was no delivery, and the deed was inoperative.

Appeal from Newaygo; Palmer, J. Submitted April 9, 1903. (Docket No. 24.) Decided June 30, 1903.

Bill by Alice Bisard and others against George Sparks, Emma L. Sparks, Edith Sparks, and Lewis J. Crawford, guardian of Edith Sparks, an infant, to set aside a deed. From a decree for complainants, defendant Edith Sparks appeals. Affirmed.

*George Luton* and *S. D. Clay* (*Grove & McDonald*, of counsel), for complainants.

*W. D. Fuller*, for appellant.

MOORE, J. Complainants filed a bill to have a deed executed by their father, Barnid Clark, to the defendant Edith Sparks, declared void and canceled, as also a lease executed by the defendant Crawford, as general guardian of Edith Sparks, a minor, to her codefendants, George Sparks and Emma L. Sparks. From a decree finding that there was no consideration for said deed, and that it was never delivered to said Edith Sparks nor to any one in trust for her, and granting the relief prayed, the defendant Edith Sparks appealed.

The record discloses that George Sparks first became acquainted with Barnid Clark, August 15, 1900. Mr. Clark at that time was 74 years old. Six days later the following paper was drawn:

"August 21st, 1900.

"I do hereby agree to let my farm to you on condition that you board me, do my washing and mending, and keep my horse, pay my taxes, keep the tools and fences in good repair. On these conditions you are to have all you raise and make therefrom as long as we do agree, or until I want to sell it, or when you go to leave the farm in the same condition as when you came, and the same amount of crops.

"Barnid Clark.
"George Sparks."

Under the above agreement George Sparks and Emma L. Sparks, his wife, taking with them their infant daughter, Edith, who was born June 6, 1900, immediately entered into possession of the farm, and Barnid Clark lived with them until the time of his death, which occurred August 21, 1901. June 26, 1901, Mr. Clark went before Mr. Brace, a conveyancer, and signed and acknowledged an instrument which had been prepared by Mr. Brace at the request of Mr. Clark, the material parts of which read as follows:

"This indenture, made this twenty-sixth day of June, in the year of our Lord one thousand nine hundred and one (1901), between Barnid Clark, of the township of Ashland, county of Newaygo, and State of Michigan, of the first part, and George Sparks and Emma Sparks (his wife), of the same place, of the second part: *Witnesseth,* that the said party of the first part, for and in consideration of certain services hereinafter mentioned to be performed by them to in hand, does by these presents grant, bargain, sell, remise, release, alien, and confirm unto Edith Sparks, daughter of the aforesaid George Sparks, her heirs and assigns, forever, all that certain piece or parcel of land. * * * The conditions of this deed referred to above are as follows: The aforesaid George Sparks and Emma Sparks (his wife) agree to support and properly care for the said Barnid Clark during his life, and to care for him and to defray the expenses of his last sickness, and after his death to defray all the expenses of his burial. And in consideration of the faithful performance of these conditions, he, the said Barnid Clark, agrees to deed as herein specified the above described premises to Edith Sparks, daughter of said George Sparks. Together with all and singular the hereditaments and appurtenances

thereunto belonging or in any wise appertaining: To have and to hold the said premises, as herein described, with the appurtenances, unto the said Edith Sparks, and to her heirs and assigns, forever.  And the said Barnid Clark, party of the first part, his heirs, executors, and his administrators, does covenant, grant, bargain, and agree to and with the said party of the second part, her heirs and assigns, that at the time of the ensealing and delivery of these presents he is well seised of the above granted premises in fee simple."

After Mr. Clark's death, this paper was taken by Mr. Sparks to a lawyer.  Some doubt was entertained as to its effect, and an arrangement was made between the complainants, Mr. Sparks, and his wife by which the latter were to retain the crops and certain stock and the possession of the farm until November 25, 1901, and they in turn surrendered the paper before referred to.  Later it was concluded that the rights of Edith Sparks under the paper could not be surrendered by her parents, and that the paper was a valid deed.  A guardian was appointed for Edith, and the guardian executed upon her behalf a lease of the premises to her father, George Sparks.  Soon thereafter this bill was filed.  The case was heard in open court.

It is claimed by complainants that the instrument is not a deed, but an agreement to make a deed in the event that certain things were done, which never were done.  It is also claimed that Mr. Clark was not competent to make the paper when it was made; that it was made without consideration, and that it was not delivered.

In our view of the record, the last-named question is the only one we need consider.  In *Taft* v. *Taft*, 59 Mich. 185 (26 N. W. 426, 60 Am. Rep. 291), the court said:

" The authorities are all agreed that no deed can be valid without delivery by the grantor.  It must be made operative by his act while he is able to act.  There are cases where deeds and mortgages found to have been in custody of the grantor at his death have been held valid, but this has been done on proof, or facts amounting to proof, that he has made an effectual delivery, and become a mere custodian

of the deed thereafter. In every case that we have discovered the question has been whether the deed had been delivered. No doubt, in some cases presumptions may have been stronger than in others, but the fact has been considered as absolutely essential, and, where the grantor has retained control of the title, it has been regarded as conclusive. One reason for this is found in the doctrine which, both under the statute of frauds and independent of it, is equally clear, that the purport of a deed cannot be changed by parol, and that no condition or reservation contrary to its terms is valid. A deed of conveyance in present terms is inconsistent with the retention of a life estate, and from the time when the deed is delivered as a conveyance the whole title goes with it, and it becomes irrevocable.

"Some difficulty was apparently raised about delivery where the grantee was ignorant of the transfer; but it has long been settled that a delivery to any third person, intended to make the conveyance operative, is a legal delivery. *Doe* v. *Knight*, 5 Barn. & C. 671; *Hosley* v. *Holmes*, 27 Mich. 416, and notes; *Souverbye* v. *Arden*, 1 Johns. Ch. 240. But a delivery to a third person, or even to the grantee, may be made for other purposes than to give the deed effect (*Johnson* v. *Baker*, 4 Barn. & Ald. 440); and the mere fact that it is put into their hands, if not as a completed transfer, will not bind the grantor. Thus, in *Jackson* v. *Phipps*, 12 Johns. 418, and in *Austin* v. *Register of Deeds*, 41 Mich. 723 (49 N. W. 923), the deposit of a deed with a public officer, but not for record, and with no purpose of giving the deed effect, was held no such delivery. In *Prutsman* v. *Baker*, 30 Wis. 644 (11 Am. Rep. 592), a deed in a third person's hands, subject to the grantor's orders, was held not delivered. And cases not unfrequently arise where a deed is handed to a grantee for inspection by himself or his counsel, or for some temporary purpose, where there is no completion of the transfer. *Johnson* v. *Baker*, *supra; Gilbert* v. *Insurance Co.*, 23 Wend. 43 (35 Am. Dec. 543).

"In *Jackson* v. *Dunlap*, 1 Johns. Cas. 114 (1 Am. Dec. 100), a deed duly executed, but retained by the grantor until the land should be paid for, and he dying before payment, was held inoperative. In *Stilwell* v. *Hubbard*, 20 Wend. 44, a deed made by the grantor, and retained by him with the distinct understanding that it would become operative at his death, and found among his papers with

a will which it was designed to alter, was held void for
want of delivery during life.    In *Fisher* v. *Hall*, 41 N.
Y. 416, it was held, after a careful discussion, that, where
a deed was retained in the grantor's custody, there must
be unequivocal proof of a legal delivery, intended to be
operative.    In *Wellborn* v. *Weaver*, 17 Ga. 267 (63 Am.
Dec. 235), where a deed was intrusted to grantor's agent,
to be delivered after death, it was also held that there
could be no continuance of agency after death, and that
there was no valid delivery."

See, also, *Thatcher* v. *St. Andrew's Church*, 37 Mich.
264; *Schuffert* v. *Grote*, 88 Mich. 650 (50 N. W. 657, 26
Am. St. Rep. 316); *Chick* v. *Sisson*, 95 Mich. 412 (54 N.
W. 895); *Burk* v. *Sproat*, 96 Mich. 404 (55 N. W. 985).

The necessity of delivery to give effect to a deed is
not in doubt, and it becomes necessary to consider the
testimony bearing upon that question.    Mr. Brace testified,
upon direct examination, that:

"I suggested to him that he leave it with the judge of
probate, or some person, any one whom he thought best,
to be given to Mr. Sparks after he was dead.    He says,
'No, I am going to keep this deed myself until just before
I die, and then I am going to give it to George Sparks
myself.'    I says, 'That is all right, but I would just make
that as a suggestion.'    'Well,' he says, 'I am going to do
it that way.'    There was nothing more said about the dis-
position of the deed, and shortly after that he went away."

His cross-examination did not materially differ from
this.

Mrs. Brace testified:

"*Q*. Just give your recollection of what he said.
"*A*. He says, 'Old Barnid knows what he is about, and
he is going to keep the deed with him until just before he
dies.'
"*Q*. Then what?
"*A*. 'Then I will give it to George Sparks.'"

Mr. George Sparks testified as follows:

"Clark had boarded with me up to the date of the deed.
I had no knowledge of the making of the deed when it
was made.    * * *    The house is a farm house, two

stories high.   In the lower part there is a kitchen, pantry, and bedroom off the kitchen, that Mr. Clark occupied. * * * I first learned of the deed August 13th.   Until that time I never knew that he had made a deed.   He never told me that he had done anything with his property; only I supposed he fixed his property, but he didn't mention it.   I supposed he had done so, because he said he wanted to go down to fix his property.   * * *

" *Q.* You may state how you came to learn about the deed.

"*A.* Well, I had been to work that day in my corn, and came up at night; got through hoeing and pulling weeds out of the corn.   I came up, and I think I had been doing some chores, and I went in, and Mr. Clark sat in a rocking chair in the kitchen, and I says, 'Uncle Barney, I have my corn all cleaned out nice.'   He says, 'I am glad of that.'   'But,' I says, 'I have a lame arm, the left arm.'   He says, 'Go in my bedroom and put some liniment on.'   I says, 'I guess I will;' and I rolled up my shirt sleeves and went into the bedroom, and took the liniment and put it on my arm.   Mr. Clark got up and followed me in there, and he opened a little drawer in his bureau, and there was a pasteboard box set in there. He moved that to one side, and he says, 'Do you see that, George?'   I says, 'Yes, sir.'   He says, 'If anything happens to me—'

" *Q.* (interrupting) What was that?

"*A.* It was in an envelope; he didn't tell me; he says, 'If anything happens, you take care of that and get it recorded.'   I says, 'What is it, Uncle Barney?   Is it something for me?'   I don't know whether he said 'No'; he said something, but I don't know what he said, but he said it was a warranty deed of this place to the baby.   Then he says, 'Take it, and go and read it.'   I took the envelope and went out, and I and the woman read it, and we carried it back.

" *Q.* Put it back in the envelope?

"*A.* Yes, sir.

" *Q.* When he made these statements he was in the bedroom?

"*A.* Yes, sir.

" *Q.* Was he standing up?

"*A.* Yes, sir.

" *Q.* Did he lie down on the bed?

"*A.* He laid down on the bed when I went out.

" *Q.* Where was he when you came back?

"*A.* Laying on the bed.

" *Q.* Did he tell you to put it back in the bureau?

"*A.* No, sir; never told me any more than when I took it.

" *Q.* Where was the baby at that time?

"*A.* She was—

" *Q.* (interrupting) She was somewhere around the house?

"*A.* She was somewhere around the house; I don't know where.

" *Q.* Your wife was not in the bedroom when he made these statements?

"*A.* No, sir.

" *Q.* You read it with her?

"*A.* Yes, sir.

" *Q.* That would be eight days before he died. Did he grow worse after that?

"*A.* Yes, sir.   *   *   *"

On the cross-examination he testified:

"*Q.* And the first you knew he had made any disposition or attempted disposition of his property was on the 13th day of August?

"*A.* Yes, sir; that is the first I knew.

"*Q.* What time in the day was it?

"*A.* It was between 4 and 6 o'clock, I should say.

"*Q.* The old gentleman was almost unable to talk then, wasn't he?

"*A.* No, sir.

"*Q.* Talked well, did he?

"*A.* Yes, sir.

"*Q.* Hadn't his daughters been there for several days before this?

"*A.* They had been there at times. He was so he was up and around.

"*Q.* You say he opened a drawer and you looked into it?

"*A.* He opened the drawer and moved this little box aside, and asked me if I saw that envelope.

" *Q.* What kind of an envelope was it?

"*A.* A large envelope.

" *Q.* Where is it now?

"*A.* I couldn't tell you.

" *Q.* What did you do with it?

"*A.* I delivered it to Mr. Wallace.

"*Q*. On that day didn't you, that evening, put the envelope back in the drawer where you took it from?

"*A*. Yes, sir, after we read it.

"*Q*. How long did it take you to read it?

"*A*. It didn't take very long; I didn't keep track of the time.

"*Q*. His desire was that you and your wife should read it?

"*A*. Yes, sir.

"*Q*. And then return it—which you did—into the same envelope?

"*A*. He didn't say to return it; no, sir.

"*Q*. You did return it?

"*A*. I put it back.

"*Q*. Asked you to read it and return it?

"*A*. I put it back.

"*Q*. When did you next see it?

"*A*. I couldn't remember the date.

"*Q*. The day he died?

"*A*. No, I didn't see it the day he died.

"*Q*. The day after the funeral? You didn't see it again until after his death?

"*A*. I saw it the day after the funeral.

"*Q*. You didn't see it again until the day after his death?

"*A*. I think not.

"*Q*. Then did you go and take it out of the drawer unbeknown to any one excepting yourself and wife?

"*A*. Yes, sir.

"*Q*. What else did you take out of the drawer?

"*A*. Nothing.

"*Q*. How?

"*A*. Yes, I did.

"*Q*. What else did you take, after the funeral, that afternoon?

"*A*. After the funeral I had the money Mr. Clark turned over to me.   *   *   *

"*Q*. What did you take out afterwards?

"*A*. Well, I took some money out the day he was buried, after we got back there.   *   *   *

"*Q*. What did you do with the $80 you took out of the drawer.

"*A*. Turned it over to Mr. Clark's children.

"*Q*. Whereabouts did it lay with reference to the deed?

"*A*. The money was in this little box I spoke of, and on Friday— I will explain it if you wish [and he did so in

detail]. · Finally I says, 'Do you want me to take care of this for you ?' and he says 'Yes.', I put it in my pocket, and from that time he never mentioned money to me.    He said there was $60.    When we counted it there was $80.

" *Q.* Who was present this Friday before he died, when he gave you this money ?

"*A.* His son Morris was there, but I don't remember whether he was there at this time or not.    *    *    *

" *Q.* Didn't you find some silver ?

"*A.* Yes, sir.

" *Q.* Before he died ?

"*A.* No, sir.

·" *Q.* How much did you find ?

"*A.* $4.75.

·" *Q.* What did you do with that ?

"*A.* Turned it over to Mrs. Bettis.

" *Q.* Together with the $80 ?

"*A.* Yes, sir; $84.75, I think.    I have a receipt.

" *Q.* Did it lay loose ?

·"*A.* It was in his pocketbook.

" *Q.* That was how long before he died ?

"*A.* It was after he was buried.    *    *    *

" *Q.* You said something, in the last conversation you had with him— He couldn't talk very plain, I suppose, could he ?

"*A.* Not at the time he gave me the money.

" *Q.* He said something to you, as I understand you, if anything happened to him he wanted that paper recorded?

"*A.* He told me if anything happened to him to take that, and take care of it, and have it recorded.

" *Q.* How long was that after you put it back there ?

" *A.* It was before— I didn't understand the question.

" *Q.* How long after you and your wife read this instrument, and you put it back in the drawer, before he told you if anything happened to him that he told you you might have it recorded?

"*A* He told me before.

" *Q.* When you took it out to read ?

"*A.* When I took it out to read he told me then to take care of it.

" *Q.* Then he told you if anything happened to him; he meant when he died?

"*A.* Yes, that is what I understood."

That is all the testimony tending to show a delivery.    It will be remembered Mr. Clark was living in his own

house, in which he had a bedroom occupied by himself. He declined to act upon the suggestion of the conveyancer to put the deed in the hands of a third person, but kept it in the drawer of his own bureau, in his own room. With the exception of the brief interval of time when it was in the possession of Mr. Sparks, to be read by himself and wife, it was in the possession and control of Mr. Clark from the time he signed it until after his death. He kept it where he kept a considerable portion of his money. Giving the testimony the most favorable construction possible for the defendant, we think it fails to show a delivery of the deed.

The decree is affirmed.

The other Justices concurred.