## COUNTY OF PROVIDENCE, MARCH TERM, 1863, AT PROVIDENCE.

PRESENT:

Hon. SAMUEL AMES, Chief Justice.
Hon. GEORGE A. BRAYTON, } Justices.
Hon. J. RUSSELL BULLOCK, }

---

## Sylvester Stone and others *v.* John E. King and others.

Volunteers under a deed of trust, defectively or not completely executed and inoperative at law, cannot have the aid of a court of equity to complete and perfect it; but if the legal conveyance be effectually made, the court will protect all equitable interests, and enforce all equitable rights and duties under it, as promptly and completely, though made without, as if made with, consideration.

The party who makes a voluntary deed, whether of real or personal estate, without reserving a power to alter or revoke it, has no right to disturb it; and as against himself it is valid and binding, both at law and in equity.

When the maker of a voluntary deed of trust delivered it to the trustee named in it, who communicated it to the *cestuis que trust* and promised them to put it on record, the deed was held to be completely executed by delivery, although the trustee subsequently refused to execute the trusts, and delivered up the deed to the maker of it to be cancelled, who destroyed it. Such a deed was established, and the trusts thereof, upon proof of its contents, were declared.

*Cestuis que trust,* unless they reject the provisions of a trust deed, are presumed to accept them, if for their benefit; and this rule holds in Rhode Island, in all cases, not excepting trusts for creditors.

It is not essential to the validity of a trust created by the beneficial owner of the trust property that there should be an acceptance or declaration of the trust by the trustee in whom the legal interest is vested.

It would be quite too dangerous for a court of equity to set aside, or refuse to execute, the trusts of a deed, upon the maker's own testimony that he was not in his right mind when he made it.

THIS was a bill in equity, filed by the complainants, heirs at law of Henry King, late of Cranston, deceased, against the defendants, John E. and William H. King, and an infant sister, also heirs at law of said Henry King, to establish a trust deed given by the respondent, John E. King, to the respondent, William H. King, of the homestead farm, in Cranston, and certain personal property of the said Henry, and for the appointment of a new trustee under said deed, and to carry out the trusts of the same.

Upon the trial of the case before the court at the present term, upon the bill, answers, proofs and exhibits, it appeared, in substance, that Henry King, during his lifetime, on the 16th day of March, 1859, executed to the respondent, John E. King, a deed of the farm in question, taking back a life-lease of the same, for the nominal consideration of four thousand dollars, but in reality, as contended by the said John E. and stated in his answer, in compensation for services performed by him for his father, the said Henry, who was a farmer and market-gardener, during many years, in carrying and selling his farm and garden produce to market; and that subsequently, on the 25th day of March, 1859, the said Henry King transferred to his said son, John E. King, by bill of sale of that date, certain horses, cattle, wagons, carts, farming tools and farm produce and provisions, for the nominal consideration of twenty-five hundred dollars, but in reality, as contended by the said John E. and stated in his answer, in consideration that the said John E. would pay the indebtment of his father for manure and family groceries,—would take upon himself the management of said homestead farm and another, adjoining, during his father's life, and support his father and family on the homestead farm, living with them thereon, as they had been

accustomed, out of the produce of both farms ; the annual profits, if any, over such maintenance, to be divided equally between the said John and his said father,—all of which the said John claimed that he had punctually and fully performed.   It further appeared, that as well before as after the death of the said Henry King, who committed suicide, his adult heirs, except the said William H. King, who had been provided for by his said father during his lifetime, claimed that the above deed and bill of sale to John E. were procured by him from his father through undue influence exerted upon him when in failing health and imbecile of mind, and designed to contest the same, unless some equitable settlement could be made of the matter ; and that pending said claim, not yet prosecuted by suit, and pending a prosecution against the said John E. for adultery, he executed the trust deed in question, conveying the homestead farm to his brother, William H. King, in trust, to pay the debts of the said Henry King, if the same should be needed for that purpose, and the remainder thereof, or so much thereof as should not be needed to pay such debts, in trust, for the benefit of said complainants and respondents, as heirs at law of the said Henry King, so that they might have, possess, and enjoy the same in the same manner that they would have done, had the said Henry King died seized and possessed of of said estate.   This deed, it appeared, on or about the 3d day of March, 1860, together with the original bill of sale of the personal property which he had received from his father, Henry King, was enclosed and sent by John E. to his brother, William H. King, with the following note :—

" CRANSTON, March 3d, 1860.

" MR. WILLIAM H. KING :

" Sir,—I send you this deed and reference, wishing that you may be satisfied until I have two trials at court, and then if I have any money left, I will send that.   I wish that this may satisfy you all as well as I am satisfied.

   " Yours truly,    JOHN E. KING."

There was also endorsed by John E. King, on the original bill of sale of the personal property, this direction :—

" Please deliver this to

" *Erel* Potter,"—

meaning, as the evidence explained, Mr. Zuriel Potter, of Johnston, who was then custodian of the personal property of the late Henry King, and was subsequently appointed, and now is, administrator on his estate.

The answer of William H. King admitted the delivery to him of the envelope containing the deed of trust and bill of sale above, and alleged that " he retained the same in his possession some two or three days, and in the meantime showed the same to said Sylvester Stone, Andrew Moffat and Zuriel Potter, and was requested by said Moffat to let him take said deed of trust, in order to put the same on record, to which the respondent replied : 'No ; I am going into the city to-morrow, and I will attend to it myself,' or words to that effect ; but afterwards, being unwilling to accept and enter upon the execution of said trusts, he neglected to comply with said request, and finally, as he then supposed, as the simplest method of ridding himself of the trouble thereof, and with that intent alone, and with no intent, knowledge, or idea of prejudicing, or in any way affecting the rights of the complainants, or other heirs of the said Henry King thereunder, and without any request to do so by the said John E. King, carried back the said deed of trust to the said John," &c.

The answer of John E. King admits, in substance, the execution of the trust deed of the homestead farm, and the sending of the same with the original bill of sale of the personal property, with the direction endorsed thereon and accompanied by the above note from him, to the said William H. King ; but in substance, sets up, that William H., refusing to accept the trust, and never having acted under the same, voluntarily came to him and delivered the same up to him to be cancelled, and that he thereupon destroyed said deed. His answer also sets up, with much circumstantiality, that he executed the trust deed under threats reported to him to have been made by some of the complainants against him, that they would shut him up by means of the prosecution against him for adultery, and would also prosecute him for the murder of his father, the said Henry King, and obtain

from him the property derived by him from his said father; and that under great alarm and disturbance of mind, caused by such threats, and whilst he was not in his right mind, he executed said deed and sent said bill of sale, and that the said deed was, on that account, void.

Much testimony was read and given, including that of the two respondents and of the complainant, Andrew Moffat, in regard to the execution, delivery and destruction of the trust deed, and as to its contents, and the threats and circumstances of duress and oppression set up in the answer in avoidance of the same; but sufficient of this evidence, or of the result of it, will be given in the opinion of the court, to render a statement of it here unnecessary.

After the destruction of the deed by John E. King, the following correspondence took place between him and three of the complainants:—

"MR. KING:

"We will confess that we were a little surprised, yesterday, at the turn affairs took. We had hoped ardently that our troubles were to be adjusted to the entire satisfaction of all parties concerned; but it seems we were to be disappointed for the present. Now, if you had any intention of doing justice when you made over those papers to William, and if you wished your other brothers and sisters to have their birthright, why not give these papers to some one who will accept the trust, and perform it faithfully. We, as the heirs, require only so much as may be left after paying all just claims, whether for wages or any other demand against the estate,—wages to whom wages are due, and interest to whom interest; after which we think it our right to share equally. Now, I will ask you, in good faith and feeling, if you consider that we ought to be satisfied with the present aspect of affairs? If you do, just write and tell us so candidly; and if not, write and let us know what you propose to do. It seems that you have an idea that it is our desire to use coercive measures; but we leave it now for you to make some proposition how our controversy is to be settled. We should not have written

to you, but from your transferring those papers.   We believe
you have a desire to settle the matter peaceably.   We expect a
reply immediately.        Yours,

(" Signed,)        ~    A. J. MOFFAT,        .
ELIZA STONE,
· SARAH G. THOMAS."

" CRANSTON, March 13th, 1859.

" DEAR SISTERS AND NEPHEW :—

·" I am not prepared to answer at present.   Mr. Moffat asked,
what motive I had in  sending those papers, and I  told him.
The parties are too  big enemies for us to give an answer, know-
ing that you have a copy of those writings you sent me.   We
are all subject to get surprised.   I have been myself before now.
" Yours respectfully,

" J. E. KING.

" To SYLVESTER G. STONE."

*James Tillinghast, for the complainants :—*
I. This is a case of a clear executed trust, which a court of
equity will always support and enforce against the maker of it
and all claiming under him; and the destruction of the trust deed
can, in no wise, affect the complainants' rights, even did not the
trustee expressly disclaim all intention of so doing.   1 Eq. Lead.
Cases, (ed. 1852,) 239, 241, 242; Hill on Trustees, 82, 83, and
notes; *Souverbye and wife* v. *Arden*, 1 Johns. Ch. R. 240; *Bunn*
v. *Winthrop*, Ib. 329; *Thomas* v. *Kyles*, 1 Jones Eq. Rep. (N.
C.) 302.

II. As to the personal property, it was not necessary that it
should be embraced in the trust deed.   The delivery of the bill
of sale of it was a symbolic delivery of the property itself, and
was sufficient to affect it with the trust.

III. The existence of the trust deed being admitted or fully
proved, the defence set up in the answer, that it was made under
duress, must be as fully proved as would be required to avoid
any other deed; *supra*, and, particularly, 1 Johns. Ch. R. 240;
1 Jones' Eq. R. 302; and the proof entirely fails.

*Currey, with whom was T. A. Jenckes, for the respondents :—*

I. The trust deed was entirely void in its creation, for want of any valuable consideration, and could not be enforced in equity, if it had not been revoked and destroyed. Mere volunteers have no equity on which to ground a claim for equitable relief. *Tuffnell* v. *Constable,* 11 Eng. Cond. Ch. 334; *Holloway* v. *Headington,* Ib. 459; *Bunn* v. *Winthrop,* 1 Johns. Ch. 329. In *Bunn* v. *Winthrop,* the trust was enforced, but the court (Kent Ch.), in giving judgment, distinguished that case from the present one in three essential points : 1. That there was no evidence of any act, at or after the making of the trust deed, denoting an intention contrary to that appearing on its face; p. 366. 2. That the subject of the trust was a chattel interest in land, not the land itself; p. 366. 3. That the facts appearing in the bill and answer amounted to proof of consideration; p. 367. And 4th, the case shows that it was not a trust *inter vivos.*

II. A voluntary trust *inter vivos* is incomplete until accepted by the proposed trustee, and while incomplete for any cause, is revocable. *Non constat* that the author would invest another with the same trust. *Antrobus* v. *Smith,* 12 Vesey, 45; *locus penitentiæ; Ellison* v. *Ellison,* 6 Ib. 656; in this case the argument turned exclusively upon the fact of revocation, not the power of it. *Walwyn* v. *Coutts,* 5 Eng. Cond. Ch. 7; *Allcott* v. *Woodgate,* 8 Ib. 97; *Garrard* v. *Landerdale,* 5 Ib. 1; in these cases the right of revocation was upheld even though the trusts were complete. 1. In the present case, the author of the trust was himself a *cestui que trust;* he had, therefore, a twofold right of revocation on his trustee's declining the trust. 2. But, assuming the trust as in any way incomplete, the authorities are uniform that equity will not set up a deed which cannot be proceeded upon at law. *Edwards* v. *Jones,* 13 Eng. Cond. Ch. 371; *Colman* v. *Sarrel,* 1 Vesey, jr., 50; *Pulvertoft* v. *Pulvertoft,* 18 Vesey, 84; *Price* v. *Price,* 8 Eng. L. & Eq. 271. 3. The circumstances attending the redelivery of the trust deed and its spoliation, show a harmonious intention, of revocation by the author and non-acceptance by the trustee. 4. The supposed trust was induced through fear and constraint, caused by the hostile language, acts and conduct of the complainants. 5. The

trust deed was sent by John E. to William H. King, as a proposal merely, and to be accepted on condition only that it should prove satisfactory to all parties. It was not satisfactory to William, or, as it appears, to others; and the conduct of all parties shows that it was regarded by them as a proposal merely, and failing of its purpose was, before acceptance, recalled by John E. King, as such.

AMES, C. J. The proposition of the counsel for the respondents, that mere volunteers have no equity on which to ground a claim for equitable relief, is quite too broad. If the deed under which they claim be defective and inoperative at law, they cannot have the aid of a court of equity to complete and perfect it, any more than they can have the aid of the court to enforce a promise, or even covenant, without consideration, to execute the deed. In other words, the court will not help them *to be cestuis que trust*, but remain neutral in regard to the defective deed, or executory contract to give one. On the other hand, if the legal conveyance be effectually made, the court will protect all equitable interests, and enforce all equitable rights and duties under it as promptly and completely, though made without, as if made with, consideration. The party who makes a voluntary deed, whether of real or personal estate, without reserving a power to alter or revoke it, has no right to disturb it; and as against himself it is valid and binding, both in equity and at law. *Ellison* v. *Ellison*, 6 Vesey, 656; *Smith* v. *Garland*, 2 Mer. 125; *Fletcher* v. *Fletcher*, 4 Hare, 76; *Kekewich* v. *Manning*, 1 DeG. M. & G. 176; *Dilrow* v. *Bone*, 6 Law Times Rep. 71; *Eaton* v. *Tillinghast*, 4 R. I. Rep. 276, 279, 280; 1 Leading Cases in Equity, and Hare and Wallace's notes, (3d Am. ed.), 297 to 335, top paging, for a collection of the cases, English and American; Adams' Equity, 79, 80, side paging.

The question then is, whether the deed, the trusts of which the complainants seek to establish, was perfected by delivery?—a question which, in this aspect, a court of equity regards in precisely the same light that a court of law would. It is admitted that it was formally executed by the respondent, John E. King, and by him sent to William H. King, the trustee named in it, who received it, communicated it to some of the *cestuis que*

*trust*, and promised to put it on record; but that, afterwards, not wishing to execute the trust, and as the easiest mode of getting rid of it, William redelivered the deed to his brother John, who destroyed it. It is quite immaterial to the question of delivery, whether John requested, or William first proposed, that it should be given up,—whether the redelivery was made with or without the advice of a justice of the peace,—whether to cut off the rights of the *cestuis*, or with no design to injure or affect them,—or whether, as John swears, William gave it to him to be cancelled, or as William swears, that he gave it to John to read, with the understanding that it was to be produced, for the purpose of settlement, at a meeting between them and the *cestuis* called for the next day, and that John, without his leave, cut off his name and seal from it. With or without these circumstances, some of which are in contest, it would be difficult to find a case from the year-books downwards, in which such dealing with a deed by the parties to it, unexplained by proof of other facts, has not been held to be a complete delivery of it. See *Garnons* v. *Knight*, 5 B. & C. 671, and *Souverbye* v. *Arden*, 1 Johns. Ch. Rep. 240, where the cases are collected; and see *Ellison* v. *Ellison*, 1 Lead. Cas. in Eq. (3d Am. ed.), notes, 304, top page, and cases collected.

It is said, indeed, that the trustee never accepted the trusts of the deed; and that hence it was incomplete. It is not essential to the validity of a trust created by the beneficial owner of the trust property that there should be an acceptance or a declaration of the trusts by the trustee in whom the legal interest is vested. *Tierney* v. *Wood*, 19 Beav. 330. The trustee received the *deed*, retained it two or three days, communicated it to the *cestuis que trust*, and promised them to put it on record. This was done with the license, and, so far as communication to the *cestuis* was concerned, at the request of the creator of the trust, as his note to the trustee, accompanying the deed, plainly shows. After this, at least, the trustee could not, without the grossest breach of trust, give up the deed to his brother, the creator of the trust, to be cancelled, or in any way affect the rights of the *cestuis* under it. *Ellison* v. *Ellison*, 1 Lead. Cases in Eq. (3d Am. ed.), 304, 306, top pages, and cases cited.

Such communication and promise bear, too, upon another ground of objection to this deed, taken by the respondents, that it is to be regarded as a mere proposal by John E. King made to the other heirs of Henry King, that the deed was to be in full settlement of all claims on their part to the estate of their father, and as it was never accepted by them as such, and until it was, it was revocable on his part. The well established general rule with regard to all deeds is, that until rejected, if for the benefit of the parties in favor of whom they are executed, they are presumed to be accepted by them. *Stirling* v. *Vaughan*, 11 East. 623 ; *Garnons* v. *Knight*, 5 B. & C. 671, and cases cited. It is equally applied to deeds of trust as to others ; and in this State, to trusts for creditors, which, in England, have been, in general, excepted out of the general rule, and until accepted, treated as proposals merely. But even in these exceptional cases, after a trust in favor of creditors has been communicated to them, it can no longer be revoked by the creator of the trust, and still less by his trustee. See 1 Lead. Cas. in Eq. *supra*, and cases cited.

There is, however, no ground in the proof, for the notion that this deed was designed by John E. King as a mere proposal to his brothers and sisters, and still less as delivered to the trustee, his brother William, and that it was to have effect only on condition that it should prove satisfactory to him and them in settlement of all claims and difficulties, and no such ground is taken in either of their answers. The deed itself was absolute as a conveyance in trust, and without condition. The note of John attending it when sent by him to William, contains no condition, but simply expresses a wish that it might satisfy all his brothers and sisters, as well as it did him ; and so far from treating it as a proposal merely, indicates that he designed to share equally with them in the property he derived from his father, even to the money which he might have left, after paying the expenses of the prosecution for adultery then pending against him. Nor was there anything done or said or omitted on the part of the *cestuis* indicating that they, too, regarded it as a proposal for a settlement merely. It was communicated to them as an act done ; and offering to put it on record themselves, they exacted and received from the trustee a promise that he would do so. When, on the day of the

meeting between all parties in Providence, one of them, and the leading and most intelligent of them, Andrew J. Moffat, was informed by William that he meant to surrender the deed to John, he told him " that he had better not ;" and the subsequent correspondence between him and John, he writing in connection with some of the other *cestuis*, contains a clear expression on their part, that the deed would have been satisfactory to them, and complains of the act of redelivery.

There is still less ground in the proof, for the objection set up to this deed, in the answer of John, that it was extorted from him by duress, and by the threats of his brothers and sisters, and whilst he was incapable to act for himself in the circumstances in which he was placed. His brothers and sisters, or some of them, had indeed claimed before the death of his father and after it, that the conveyances of property which he had obtained from his father were without consideration, and were extorted from him by undue influence exerted upon one in failing health and of disordered faculties. Whether this claim were well or ill founded is of no consequence now, since both claim here, mediately or immediately, under these conveyances. Sufficient evidence has been laid before us to indicate that it was not a fraudulent claim, without any foundation, but a fair subject of controversy, however upon full proof it might have been decided, had the conveyance in question not brought that controversy to a close. During this controversy, both before and after the death of his father, he was under prosecution for living with a woman in his father's house, in open adultery. This he knew to be displeasing to his brothers and sisters, deterring, as it properly should, some of them from visiting at the house. The proof, however, entirely fails to establish that either of the complainants instigated this prosecution, or even appeared, as they might well have done, as witnesses against him. The reports which he heard, or the fears which he might well entertain to that effect, appear to have been wholly without foundation. One of the complainants, indeed, a nephew of John, coming home from California, and finding him under arrest upon the complaint of the injured husband, and that his uncle was openly living at the homestead, in his father's family, with the wife of the prosecutor, who desired merely to

separate her from him, concurred in this desire, and wished to remove such a nuisance from the home of the family, and to that end gave the prosecutor the names of two witnesses, but wholly refused any further assistance. With this exception, it does not appear that any of the complainants aided the prosecution in the least, although they might well have sympathized, under such circumstances, with the prosecutor. Still less does it appear that any of the complainants used this prosecution, by threats or otherwise, to extort this deed from their brother or uncle, or any similar or other settlement of their claim upon him.

The pretence set up in the answer of John, that they even accused him of the murder of his father by way of exciting his alarm, and of raising in him just fears for his safety and freedom, is, upon the evidence, idle in the extreme. The facts bearing upon this accusation, sworn to by Moffat, and not contradicted by any one of the persons present, amount to this : that the witness, on hearing that his grandfather had taken poison, went to see him about twenty-four hours after he had taken it, and found that, during all this time, no physician had been sent for by his son, John, who was the master of the house, to administer to his relief; and indignant at what seemed to him such gross neglect, observed, that " it was murder to let a man lay in that manner." The next day the witness explained, in the presence of John, upon his expression as above being adverted to, that " he wanted no one to understand that he thought that anything had been given to the old man by any one to cause his death, but that he thought that he had been drove to it ;" to which John replied, " after this is over, we'll see who has the longest lash to drive with." The result of the evidence upon the point of duress is this : that John E. King, knowing the claim made upon him by the complainants, and harassed by his fears about the prosecution for adultery hanging over him, while he knew that they might aid his conviction, as a matter of policy, determined to change his relations with them, by yielding the matter in dispute ; and with this view, executed and delivered the deed of trust in question without any threat or demand on their part, and without any previous communication by him to them of his intention to take such a step. He voluntarily, and without *suggestion* even

from them, took this course, for aught that the evidence, including his own, indicates, for the purpose of satisfying their claims and of deprecating their imagined vengeance against him, which he feared might be exerted through the pending prosecution. He sent the deed to his brother William, whom, he avows, that he thought " was the hardest against him ;" and when he found that William had no such unbrotherly designs as he had been led to suppose, but, on the contrary, sympathized with him, he was quite ready to accede to his proposal to take back and cancel the deed, which, ignorant and misadvised, William was disposed to surrender to him. In all this we can discover no such duress or oppression as will avoid a voluntary deed, either at law or in equity,—no such extortion or even demand of the deed from him when in such a position that he could not safely refuse anything that they demanded from him, that raises anything so palpable, as an equity on his part against the deed which a court of equity can act upon. It was his own free act of policy under the circumstances in which his misconduct had placed him,—neither asked or expected by the complainants, or the other heirs of Henry King. He was very much disturbed until he had done it ; but, as he tells us in his evidence, found immediate relief from it, and in his note accompanying the deed, hoped that it would satisfy all as well as it did him. There is no evidence before us that it would not have satisfied them, if, colluding with the trustee, he had not, upon a change of policy, suppressed the deed after he had delivered it, and not only waked up the old contest, but originated a new one over the deed. The correspondence between him and some of the complainants, after the redelivery of the deed, is full to this. This deed provided, to the extent of the trust property, for all the debts of Henry King, including, of course, John E.'s claim for services rendered to him which remained unsatisfied. These services, as he avows, were but partly compensated by his father's gift to him of the farm embraced in the deed of trust ; and we can take care, in the decree, that in any proceeding he may institute for these services, the value of this farm shall not be reckoned against him.

We have not noticed the suggestion of John E. King, in his answer, that he was not " in his right mind," at the time that he

executed and delivered the deed of trust, and could neither eat nor sleep. If by this he means that he was greatly disturbed by his isolation from his family and natural friends, when contending against a public prosecution which his own gross misconduct had brought upon him, he felt as any sane man would feel under similar circumstances. It was "a touch of nature" which no one, not brutally insensible, could help. Except in his own testimony, we look in vain for any evidence worth considering, that he did not perfectly understand what he did, and shape his policy through it to an end that he greatly desired. To those about him he seemed as usual, acting in his business, whether in or out of court, with calmness and discretion,—so that if we believe that he was not in his right mind, we have little more than his own word for it. It would be quite too dangerous for a court of equity to set aside or refuse to enforce the trusts of a deed, upon the maker's own testimony that he was not in his right mind when he made it.

A question has been raised, whether the deed of trust included the personal property embraced in the bill of sale from Henry King to his son John. It is Moffat's *impression* that it did; but this can hardly avail against the explicit testimony of the scrivener who drew it, and the answer and testimony of William, the trustee named in the deed. The delivery by John of the bill of sale of this property to him executed by his father, to William, unaccompanied by the delivery of the property itself, with directions that he should deliver it to Zuriel Potter, then custodian, and afterwards administrator of Henry King, indicates an intent to surrender to the estate of his father the evidence of his title to this property, which once belonged to his father. The surrender was never completed by delivery of the property, nor would Potter even retain the bill of sale. It seems to us, at most, evidence of an intent to surrender, never legally carried into effect; and treating it, as we do, as a voluntary conveyance, we must remain neutral with regard to it. But however this may be, the surrender, if made, was to Potter, as administrator on the estate of Henry King, who is no party to the bill, and is entitled to no relief under it.

Let a decree be entered, in conformity to this opinion.