. McCALLA *v.* BANE *et al.*

(*Circuit Court, D. Oregon.* April 20, 1891.)

1. AMENDATORY ACT.
   Act Feb. 25, 1889, (Sess. Laws, 75,) entitled "An act to amend section 3101  *  *  * of the Annotated Laws of Oregon," in which said section is set out as amended. is not in conflict with either section 20 or 22 of article 4 of the constitution of Oregon, as expounded by the supreme court of the state in *State* v. *Phenline,* 16 Or. 107, 17 Pac. Rep. 572.

2. IDEM.
   Said section, as amended, not only makes an illegitimate child the heir of its. mother, but legitimates it, so that it may inherit through its mother, provided the parents were "formally married,"—married in form,—and "lived and cohabited as husband and wife," although such marriage may be void in law.

3. DEED; DELIVERY OF.
   The delivery of a deed by the grantor to a third person, to be given to the grantee at once, or on the happening of some future event, as his own death, is a good present delivery to the grantee, and vests in him the estate of the grantor; but it is otherwise if the grantor reserves to himself any future control over the deed.

4. INTEREST IN SUBJECT-MATTER OF SUIT.
   The plaintiff having conveyed to another the "undivided one-half" of the property involved in this suit before the commencement of the same, and it appearing that she claims as the heir of her father, and that as such heir she could not be entitled to more than one such half, she is without interest in the subject-matter of the suit, and cannot maintain the same.

5. CONSIDERATION IN DEED.
   The consideration in a voluntary conveyance cannot be contradicted or disproved by one claiming under the grantor, by matter subsequent, as by descent, for the purpose of impairing the effect or operation of the same.

6. CASE IN JUDGMENT.
   Plaintiff in her bill alleged that her father, James B. Stephens, being old and incapable of transacting business, was induced by the defendants to convey all his property to them, to the exclusion of the plaintiff, his lawful heir, and that said deeds were void for want of capacity in the grantor, and therefore ought to be set aside, and the plaintiff admitted to her inheritance. *Found,* that the plaintiff, years before her father's death, and continuously thereto, had so conducted herself as to incur his serious displeasure, and that such conveyances were made by him after long and careful consideration, free from the influence, persuasion, or suggestion of any one, for the purpose of bestowing his property on the defendants, his relatives and friends, for reasons satisfactory to himself, and commendable generally, and to exclude the plaintiff from any benefit thereof; that at the time of signing said deeds Stephens was both mentally and physically capable of executing the same, and fully comprehended the nature and effect thereof, the details of which he had planned in his mind long before, and then and there duly delivered the same to a third person, for the grantees therein named.

(*Syllabus by the Court.*)

In Equity. .
*W. Scott Beebe, John Gearin,* and *William B. Gilbert,* for plaintiff.
*James K. Kelly, Emmet B. Williams,* and *Paul R. Deady,* for defendants.

DEADY, J.   This suit was commenced on April 12, 1889, by Elizabeth McCalla, a citizen of the state of California, against the defendants Mary A. Bane, Henry Jones, Franklin T. Dick, C. H. Raffety, Rosetta Jones, James McAyeal, Harriet Bennett, and school-district No. 21, in Multnomah county, who are citizens of Oregon.   On June 13th an amended bill was filed, making Samuel T. Stephens, J. W. Sexton, and India Simmons, also citizens of Oregon, defendants.

This suit was brought to have certain conveyances of real property, made by the father of the plaintiff, James B. Stephens, in his last illness, declared inoperative and void on account of the alleged incapacity of the grantor to execute the same, and for want of sufficient delivery.

In the bill it is alleged that the plaintiff is the only heir of her father; that on March 16, 1889, he being 83 years of age, and weak physically and mentally, and thereby rendered incompetent to transact business, the defendants, then and before intending and contriving to deprive the plaintiff of the property of her father, procured and forced him to sign a number of deeds conveying all the real property of the deceased, alleged to be worth $250,000, to them in severalty; that the defendants J. W. Sexton and India Simmons, although not named in said conveyances, claim an interest in said property.

On July 1st the defendants Henry Jones, Franklin T. Dick, C. H. Raffety, Rosetta Jones, James McAyeal, Harriet Bennett, and school-district No. 21, answered the bill jointly, and on August 5th Samuel T. Stephens answered, and Mary A. Bane, on the 6th of the same month, separately.   By their answers these defendants admit that the plaintiff is the daughter of Stephens, but deny that she is his only heir, and allege that India Rolfe, now deceased, was his daughter, and that the defendants Rosetta Jones and J. W. Sexton are her children, and that India Simmons is her granddaughter, being the only child of her daughter Amanda Simmons, now deceased, and that, as the representatives of said India Rolfe, they are entitled collectively, under the laws of the state of Oregon, to one-half of the property of which Stephens died seised.

They also admit the conveyance of the real property of Stephens, as alleged in the bill, on March 14 and 20, 1889, but deny specifically all the allegations thereof concerning the incapacity of the grantor, and allege that the deeds executed on March 14th were delivered by the grantor to the grantees in person, and those on March 20th were delivered to John T. Stewart, under the advice of his counsel, then present, as and for the grantees therein named, to whom the latter afterwards gave them; that the defendants, nor neither of them, did nothing to influence the action of Stephens in this respect, and did not know to whom he was going to convey the property until the time of the execution of the conveyances; and that his mind was clear and comprehensive up to the last moment of his life.

On July 13th the defendants J. W. Sexton and India Simmons filed an answer, and what is denominated a "cross-bill," in which they allege the invalidity of the conveyances to the other defendants for the causes stated in the original bill, and aver that Stephens died intestate, and

that they, with the defendant Rosetta Jones, are entitled in right of India Rolfe, the mother of the former and grandmother of the latter, to an undivided one-half of his estate.

The other defendants in the original bill answered the cross-bill, admitting that the plaintiffs therein, together with the defendant Rosetta Jones, are heirs of James B. Stephens, as therein alleged, and that he died intestate, but allege that he conveyed all his property to the defendants in the cross-bill except Elizabeth McCalla, and that said conveyances were made of the grantor's own free will and while he was of sound mind and memory, and delivered by him in person to some of the grantees and to John D. Stewart for the others.

The answer of the plaintiff to the cross-bill admits the allegations therein concerning the execution and delivery of the deeds, but denies that J. W. Sexton, India Simmons, or Rosetta Jones are heirs of James B. Stephens, and alleges that one Edward S. Sexton and Angeline Belshee were duly married in the state of Illinois in the year 1848; that in the year 1850 said Sexton deserted his wife, and came to Oregon, where he lived until his death, in the year 1877; that India Stephens was the daughter of James B. Stephens and sister of the plaintiff; that J. W. Sexton, Rosetta Jones, and Amanda Simmons are the illegitimate issue of Edward S. Sexton and India Stephens, who were never married; that said Amanda died in 1884, leaving an only child, India Simmons; and that said Edward S. Sexton and Angeline Belshee were never divorced.

Replications were duly filed to the several answers, and much testimony taken *pro* and *con*, before an examiner of this court.

On the hearing, the bill of the plaintiff was dismissed as to Samuel T. Stephens and Harriet Bennett, on the statement of counsel that the plaintiff would not further contest the validity of the deeds made on March 14th.

After careful consideration of the evidence I find the material facts of the case to be as follows:

1. In 1844, James B. Stephens and Elizabeth, his wife, settled on a tract of the public lands, containing 640 acres, which they afterwards acquired under the donation law, lying on the east side of the Wallamet river, opposite Portland, on which the town of East Portland has since been laid out and built up, and resided there continuously during the rest of their lives.

2. The children of these people were a son, James B., long since dead, the plaintiff, India, who first married one Alderman, and after his death was formally married in 1851, in her father's house, by a minister of the Methodist Church,—the Rev. James H. Wilbur,—to one Edward S. Sexton, with whom she afterwards lived and cohabited as husband and wife in Oregon, until the death of the latter in 1870, after which she married one Rolfe, and died before her father, in 1878.

3. Said Sexton, whose full name was Edward Styles Sexton, was married in Fulton county, Ill., in January, 1843, to Angeline Belshee, and lived there with her until 1850, when he came to Oregon, and was married to India Alderman, as above stated, without being then or at any

time divorced from said Angeline. The issue of this marriage were the defendants Rosetta Jones and J. W. Sexton and Amanda Simmons, who died in 1884, leaving an only child, the defendant India Simmons, which children were and are, as a matter of fact, illegitimate.

4. The plaintiff, Elizabeth McCalla, is near 50 years of age, and at the commencement of this suit was a citizen of California. Some time prior to 1870 she was married to one Dr. A. M. Loryea, to whom she bore three children, and from whom she was subsequently separated, and later divorced. After leading a disreputable life both before and after the divorce, and acquiring the habit of using strong drink and opium, she was married some years since to her present husband, one George McCalla, who appears to be a fit companion for her.

5. James B. Stephens was born in West Virginia in 1806. He was a cooper by trade, and a person of limited education. He had a strong mind and body, considerable experience in the ways of the world in the common walks of life, was a close observer, had a retentive memory, and was very resolute and persistent of purpose and opinion. When the plaintiff was married to Loryea he gave her, for her own use and benefit, three blocks of ground in East Portland, now worth about $50,000. About the same time he engaged in the banking business with her husband, which soon brought him to the verge of bankruptcy, and compelled him to dispose of his property to raise a large sum of money to pay his debts, which left him comparatively poor. A few years before his death he succeeded in having this disposition of his property declared a mortgage, and in raising the money to satisfy the same, and then, by the sale of lots and blocks, in discharging the indebtedness altogether, which left him the owner of the property covered by the deeds now here drawn in question, and a parcel of the donation, now known as the "Clinton and McCoy Tract," which he sold about a year before his death for $35,000. This sale was made for the purpose of distributing the proceeds among his relatives and friends, whom he wished to remember and serve.

6. About the year 1873, while the plaintiff was living separate from Loryea, she took a young man into her house, with whom she was understood to be living in a state of adultery. On this account, her father went to her house, and on his knees beseeched her to change her life and behave herself; to come home and live with him and her mother, where she should never want for anything. In response, the plaintiff spit at him, and said: "It's none of your d—d business what I do. I will do as I G—d d—d please." Thereupon, her father rose up and went away, saying: "I hope you will see the day when you will have to beg for a living." He never spoke to her again, and apparently then and there formed the purpose, to which he ever afterwards adhered, of disinheriting her.

7. On May 30, 1878, Stephens and his wife each made a will, designating the other as his or her devisee, and cutting the plaintiff off with one dollar. In 1887, Elizabeth Stephens died, and her husband canceled his will by tearing his name from it. Thereafter, during his last

illness, some friends and neighbors, knowing that Lizzy, as the plaintiff was called, was a poor invalid and castaway living in Southern California, endeavored to have him make some provision for her, but he could not be moved from his determination, and referred bitterly to her treatment of him, adding that "money would do her no good;—it might as well be thrown in the Wallamet."

8. On March 22, 1889, James B. Stephens died at his home in Stephen's addition to East Portland,—where he had lived for many years,—of old age, aggravated by chronic bronchitis. For some months before his death he was confined to his house, and much of that time to his room and bed. During this time he was conscious that his end was drawing nigh, and for some weeks before his decease he was revolving in his mind the disposition of his remaining property among his friends and relatives, to whom he felt under obligations, or thought worthy of his bounty, or desired to serve. This property consisted of a section of land in Washington county, known as the "Sexton Donation;" a place in Stephens' addition aforesaid, containing about 19 acres, called the "Homestead," on which he was living; block 191 in East Portland; and a portion of the proceeds of the sale of the Clinton and McCoy tract aforesaid.

9. About two months before his death, Stephens directed the defendant Henry Jones to survey and plat the homestead tract, dividing it into six unequal parts, one of them to include his house, which was done to his satisfaction.

10. On March 14, 1889, Stephens conveyed the Sexton donation, valued in 1881, in a suit for partition, at $3,500, to the defendant Henry Jones, as compensation for his services as the faithful manager of his affairs for the past several years, and to the day of his death, in addition to the sum of $1,542.50 he had already paid him on the same account. On the same day he conveyed, as a gift, block 191 aforesaid, theretofore held for sale at $2,000, to his niece Mrs. Harriet Bennett; and in like manner the Wheeler farm of 160 acres to his nephew, Samuel T. Stephens. This farm is situated on the Sandy, a few miles east of Portland, and was purchased by the defendant Henry Jones a short time before, under the direction of Stephens, for the benefit of said Samuel, at a cost of $4,000.

11. On March 16th Stephens directed the defendant Henry Jones to have the notary, Mr. John T. Stewart, prepare six deeds for the six parcels of land into which he had platted the homestead as aforesaid, numbering them from 1 to 6, consecutively, as on the plat, and leaving a blank for the name of the grantee in each, which was done, and the deeds examined and approved on the same day by Stephens.

12. About noon of March 20th Stephens sent for the defendant Henry Jones, and gave him the name of the grantee to be inserted in each of said six deeds, when the latter made a memorandum of the same as follows: "No. 1, Mary Bane; No. 2, Rosetta Jones; No. 3, C. H. and Dave Raffety; No. 4, James McAyeal; No. 5, school-district No. 21; No. 6, Frank T. Dick." Thereupon he sent Jones for the notary, Mr.

Stewart, and his attorney, Mr. Richard Williams, saying he wanted them "to come quick, and finish these deeds." Jones went to the notary's office, and gave him the names of the grantees, which were written in the deeds by the latter. Then, after finding Mr. Williams, the three went to Stephens' house, where the deeds were signed and acknowledged by the latter. The deeds and acknowledgments, although in fact executed and taken on March 20th, are in fact dated on March 16th, for the following and no other reason: When the notary wrote them on the latter date he supposed the deeds were to be executed at once, and so he dated them as he did; and when they came to be executed it does not seem to have been thought worth while to change the dates.

13. The execution and delivery of the deeds took place as follows: Stephens raised up in bed without assistance; a book was placed on his knees; the deed was laid on it before him; he took a pen and wrote his name legibly, and with apparently as little difficulty or trepidation as in the case of his signatures to the deeds executed on March 14th and to the leases written in 1884. The signatures were then attested by the notary and attorney, when Stephens said to Stewart, Henry and Rosetta Jones and Mary Bane being still present: "You keep these deeds, and after I pass away you give them to the parties named in the deeds. I don't want them recorded yet." Henry and Rosetta Jones and Mary Bane then left the room, when Stephens, after resting a little, said to Mr. Williams: "How should I do with these deeds to make them good? I want the parties to have them." Williams replied: "You can deliver the deeds to Stewart for the parties, if you want to." Stephens then said to Stewart, who had the deeds for the purpose of affixing his seal to the certificates of acknowledgment: "You take the deeds that way, for the parties named in them. I would rather not have them recorded until I am dead." Stewart took the deeds, as requested, and kept them until the grantor's death, when he delivered them to the grantees as directed. Then, at the suggestion of Stephens, a deed was prepared, conveying to Henry Jones any "odds and ends of land," as he said in his donation, not theretofore disposed of or conveyed to any one, which was then and there executed by him, and delivered to Jones. Then Stephens suggested that parcels of this property were under lease to third persons; that the leases were in his safe, and each ought to be assigned to the grantee of such parcel, which was done. In all this business Stephens acted solely with a view of bestowing his property upon his friends and relatives, for reasons satisfactory to himself, and generally commendable, and of excluding the plaintiff from any benefit thereof.

15. The consideration named in these conveyances was inserted under the direction of Stephens, without consultation with any one, as representing, in his opinion, the value of the land thereby conveyed; and their execution on March 20, 1889, was the final result of a deliberate and well-considered purpose on his part to dispose of his property in his life-time, by deed, and not by will, to the persons therein named, and to exclude his daughter, the plaintiff, as well as J. W. Sexton and India Simmons, from any benefit of the same; that at the time of the exe-

cution thereof, and up to the moment of his death, his mind was clear and comprehensive, and he fully understood the nature and effect of such conveyances; and that the same were planned and executed by Stephens, without the influence or persuasion of any one, and without knowledge on the part of any one but himself, up to the time of their execution, who were to be named as the grantees therein.

16. Rosetta Jones is a granddaughter of Stephens, and for years before his death was very attentive and kind to him and his wife.

James McAyeal is a thrifty, industrious man. He married Stephens' favorite grandaughter, Elizabeth Jane, the daughter of India Sexton, who had been brought up in his family, and died in 1882. Since then he married a favorite grandniece of Stephens.

Franklin T. Dick is a nephew of Stephens, being his sister's child, and a person in whom he evidently took some pride, as he was postmaster at Pendleton, and a member of the legislature from Umatilla county.

Mary Bane is a niece of his wife, and served him faithfully as nurse and housekeeper for two years before his death.

Charles H. and David Raffety are old and valued friends and neighbors, who had been his family physicians, and indorsed his paper for a large amount, when he was in financial trouble.

The voters of school-district 21 had lately named their school for him, and he was pleased with the attention; in fact the gift was only a diversion of one that he had long contemplated making to the town of East Portland. J. W. Sexton is a grandson of Stephens, and in February, 1888, he gave him two lots and a house valued at $1,500, with the understanding that he should keep the property for a home; but instead of that he mortgaged it to raise money to go into the saloon business, and lost it. This offended Stephens, and convinced him that it was no use to do anything for him, and so he said he never would try to help him again.

India Simmons is the great-granddaughter of Stephens. In the spring of 1888 he wanted her to go to school at St. Helen's Hall, and made arrangements to maintain her there for a regular course of study. She refused to accept the offer, and married Simmons. This disgusted Stephens, and he said he never intended to do anything more for her; and—

17. On April 9, 1889, the plaintiff and her husband, by their deed duly executed, conveyed to W. T. Williams and H. H. Boyce, for a valuable consideration, "the undivided one-half part" of all the property, real or personal, belonging to the estate of the late James B. Stephens, of which he died seised, possessed, or entitled.

And as conclusions of law from these facts I find:

1. That the seven deeds signed by James B. Stephens on March 20, 1889, were duly executed and delivered to the several grantees therein named; as also the one to Henry Jones on March 14, 1889, for the Sexton donation.

2. That the children of India Sexton are legitimate by virtue of the act of the legislative assembly of Oregon, entitled "An act to amend section 3101 of title 3 of chapter 23 of the Annotated Laws, passed Febru-

ary 25, 1889, (Sess. Laws, 75,) of Oregon, which provides that said section "shall be and hereby is amended as follows:"

"Sec. 3101. An illegitimate child shall be considered the heir of its mother, and shall inherit or receive her property, real or personal, in whole or in part, as the case may be, in like manner as if said child had been born in lawful wedlock; but such child shall not be entitled to inherit or receive, as representing his mother, any property, real or personal, of the kindred, either lineal or collateral, of such mother: provided, that when the parents of such child have formally married, and lived and cohabited as husband and wife; such child shall not be regarded as illegitimate, within the meaning of this act, although such formal marriage shall be adjudged void."

3. That by the conveyance of April 9th to Williams and Boyce the plaintiff divested herself of all interest in the estate of her father to which she could be entitled as heir, and therefore cannot maintain a suit, or be heard to question the validity of the conveyances to the defendants.

I do not propose to discuss the evidence bearing upon the foregoing conclusions of fact but very briefly.

In the first place, all the allegations of the bill and cross-bill affecting the validity of these deeds are explicitly denied in the sworn answers of the defendants, and the burden of proof is upon the plaintiff to overcome the same and establish the contrary. The plaintiff not having expressly waived, in her bill, the oath of the defendants to their answer, they had to be given under oath, and are evidence in their behalf. Eq. Rule, 41; *Conley* v. *Nailor*, 118 U. S. 134, 6 Sup. Ct. Rep. 1001.

The evidence as to the capacity of Stephens to transact the business he did on March 20th, namely, the execution of the deeds, is conflicting, but the great weight of it, both as to credibility and pertinency, is in support of the conclusion stated. Much of that introduced by the plaintiff is the merest gossip and tittle-tattle, and includes statements on the subject attributed to some of the defendants, that are not only improbable under the circumstances, but which the parties unequivocally deny.

John Collins and Samuel T. Stephens are the principal witnesses for the plaintiff on this point. In my judgment neither of them are entitled to credit. The testimony of both is very improbable, and in parts manifestly false. The first one does not appear to be a person of any standing or character, but the contrary, and is evidently disappointed that he was not remembered in some way by the deceased. The second one, in his answer to the bill and cross-bill, denied under oath the allegations therein, impugning the validity of the deeds, and averred that at the time of the execution of the same, and up to the very moment of his death, Stephens "was in possession of all his faculties, and fully comprehended the meaning and terms of any transaction he undertook to perform, and directed and managed everything that was done by him concerning the matters complained of in said bill." Afterwards, and on November 29, 1889, he testified for the plaintiff, in what is called "rebuttal," just the reverse of what he did in his answers, saying, among other things, that Stephens was not physically capable of signing his name on March 20th, when, as is now practically admitted and proven beyond a doubt, he did then sign his name to the deeds in ques-

tion, as legibly as usual, and without aid or inconvenience. This witness is quite positive, however, that on March 14th, when the conveyance to himself was executed, Stephens was fully competent, both mentally and physically, to do what he did, but became incompetent immediately thereafter. And finally, in consideration of this attempt to serve the plaintiff, as it appears to me, the bill as against him was dismissed at the hearing.

Several physicians were called by the plaintiff, and testified as experts upon the hypothesis stated to them, that a person in Stephens' condition was not capable of transacting important business. But the case given them by counsel for the plaintiff is as different from the real Stephens case as day is from night. The fact is, as the evidence plainly shows, he was, under the circumstances, as capable of transacting the business he did on March 20th—the execution of these deeds—as any one of the medical experts.

For it must be remembered that it is one thing to have executed these deeds as the final act of a long and well-considered purpose for the disposition of 19 acres of land, on which he had lived for a quarter of a century, and quite another to have considered and acted upon an important business proposition concerning a matter with which he was not familiar, and which was then for the first time presented to him.

The business of disposing of this property among his relatives and friends was thought out and arranged in the main in the mind of Stephens long before the deeds were executed, and all that remained to be done on March 20th was the simple act of signing the same, which, in my judgment, he was fully capable of doing up to the last moment of his life.

It is hardly necessary to say anything in support of the finding that the failure to include the plaintiff in the disposition of his property was not the result of any adverse impression made on Stephens by any of these defendants or any one else; for if there is any one fact established in this case beyond a peradventure, it is that for at least 16 years before his death he never wavered in his purpose to disinherit her. This intention was formed on that, to him memorable day, when, in answer to his entreaties on his bended knees, to come home and live decently, she drove him from her door with a scorn and contumely unworthy of her sex, let alone a daughter.

The facts concerning the execution and delivery of the deeds are stated in the finding. There is no conflict in the evidence on this point. Mr. Richard Williams, a distinguished member of this bar, who was present as Stephens' legal adviser, made a detailed memorandum on the next day of what transpired on the occasion, which was put in evidence as a part of his testimony. His statement is corroborated by that of every person who was present, including the notary, Mr. Stewart, a disinterested witness, who is the mayor of East Portland, and long engaged in respectable business here.

And now as to the conclusions of law; and, *first*, as to the delivery of the deeds.

Delivery is essential to the due execution of a deed. It takes effect only from delivery. The deed may be delivered to the party himself. It may be delivered to a stranger as an escrow, to be kept by him until certain conditions are performed, and then to be given to the grantee. Until the condition is performed the property does not pass, but remains with the grantor; and it is ordinarily considered as the deed of the grantor from the time of the second delivery. A deed may also be delivered to a third person as a deed, to be delivered to the grantee on the happening of some future event. In such case the writing is a valid deed from the beginning, and the third person is a trustee for the grantee. Shep. Touch. 55; 4 Kent, Comm. 454; *Souverbye* v. *Arden*, 1 Johns. Ch. 240; *Wheelwright* v. *Wheelwright*, 2 Mass. 447; *Hatch* v. *Hatch*, 9 Mass. 307; *Blight* v. *Schenck*, 10 Pa. St. 285; *Steele* v. *Lowry*, 4 Ohio, 72; *Shirley* v. *Ayres*, 14 Ohio, 307 (45 Amer. Dec. 546;) *Hoffman* v. *Mackall*, 5 Ohio St. 124; *Church* v. *Gilman*, 15 Wend. 656; *Foster* v. *Mansfield*, 3 Metc. (Mass.) 412; *O'Kelly* v. *O'Kelly*, 8 Metc. (Mass.) 439; 3 Washb. Real Prop. (5th Ed.) 306; 5 Amer. & Eng. Enc. Law, 448.

Of course the delivery of the deed to the third person for the grantee must, as contended by counsel for the plaintiff, be absolute. No future control of the instrument must be reserved to the grantor. As was said in *Church* v. *Gilman*, *supra*, whether the grantor divests himself of his estate by the transaction depends on the delivery of the deed. "If the delivery is absolutely as his, the grantor's deed to the stranger for the use of the grantee, the delivery is good; but if it be delivered to the stranger, subject to the future control of the grantor, no estate passes."

Now, these deeds were delivered to the notary for the benefit of the grantees, four of whom were absent, to be handed them on the death of the grantor.

He said without qualification that he wanted the grantees to have the deeds,—the benefit of them,—and to make sure of it he asked his counsel how it could be done. He answered correctly: "You can deliver them to Stewart for the parties,"—when the grantor replied: "Stewart, you take the deeds that way for the parties named in them. I would rather not have them recorded until I am dead." The notary took the deeds "in that way" for the grantees, as their agent, and gave them to the parties as directed. From that moment the power of the grantor over the deeds was gone. He was well assured that he would soon pass away. He had, after due deliberation, just succeeded, in the exercise of his undoubted right, in disposing of the remainder of his property to his own satisfaction. He made no reserve, and had none to make, except the harmless wish that the transaction should not be blazoned to the public by the deeds being put on record before his death. If ever there was an absolute delivery of a deed to a third person for the use of the grantee therein this was one. Indeed, the delivery was good as an escrow, as well as the personal deed of the grantor, and took effect as his deed on his death. 5 Amer. & Eng. Enc. Law, 451.

*Second.* The legitimacy of the children of India Sexton.

India Alderman, *née* Stephens, was formally married—married in form—to Edward S. Sexton, and thereafter they two "lived and cohabited as husband and wife" for many years, and until Sexton died. By this act of 1889 it is declared that the children of this marriage "shall not be regarded as illegitimate within the meaning" of the same. What significance ought to be given to the phrase "within the meaning of this act" it is not necessary now to consider. Without it the children are apparently made legitimate to all intents and purposes, and might inherit from the father as well as the mother, and through both of them. It is sufficient for the purposes of this case to hold that children so born, though not in lawful wedlock, are by the act made legitimate, at least as to the mother; and therefore they and their descendants may inherit through her as her representatives. It follows that the children and grandchildren of India are lawful heirs, as her representatives, of James B. Stephens.

But it is contended by counsel for the plaintiff that this act is unconstitutional and void because the "subject" of it is not expressed in the title, as required by section 20 of article 4 of the constitution of the state; and the *Case of The Borrowdale*, 39 Fed. Rep. 376, decided by me in the United States district court, is cited in that behalf. Without stopping to consider how far that case supports this contention, it is sufficient to say that in *State* v. *Phenline*, 16 Or. 107, 17 Pac. Rep. 572, the supreme court of the state has held that an act amendatory of a section of an act does not require a new title; that the title of the original act applies to the amended one and expresses the subject of it, "unless there has been a clear departure and complete change of substance from the original."

The amendment in this case is contained in the proviso to the end of the section, and is clearly on the same subject as the original,—the descent and distribution of property in the case of children born out of lawful wedlock. It qualifies its operation in the case of such children whose parents were "formally" married and lived together as husband and wife. The court also said in *State* v. *Phenline* that, construing said section 20 with section 22 of the same article, regulating the amendment of statutes, "it is sufficient, in amending a section of an existing law, to designate such amendment as the "subject of the amendatory act."

This construction of the constitution of the state is binding on this court, and, tried by it, this act, in my judgment, is clearly valid.

The policy and justice of it no one will dispute, and its operation in this and like cases fully justifies its enactment.

*Third.* The effect of the conveyance by the plaintiff on April 9th to Williams and Boyce.

The conclusions already reached show that the plaintiff never had any interest in the property covered by these deeds; and that her bill must be dismissed on that account.

But if the fact were otherwise, and these deeds were void, by this conveyance she has divested herself of all interest in the property, and therefore cannot maintain this suit. When she commenced her suit she had

no interest in the subject-matter. Argument cannot make this matter any plainer than the language of her deed. It conveys "the undivided one-half" of the property, which is all she was entitled to, if her father had died without making any disposition of the same. The conveyance was evidently made on the supposition that she was the only heir, and succeeded her father as such. But on investigation it turns out that the children of India are legitimate for the purpose of claiming through her the interest in her father's property she would have been entitled to if she had survived him. This is one-half, leaving the other undivided half to the plaintiff, which she appears to have disposed of before the commencement of this suit.

An attempt was made, after the case was submitted, to cure this mistake by the introduction of a writing in which the parties to this deed undertake to limit the effect of the language used in it by declaring that the grantor only thereby intended to convey, and the grantees only expected to receive, an undivided one-half of the plaintiff's interest in the property, whatever that might be. But a deed cannot be limited in its operation, contrary to its plain language, in that way. The grantees in the deed of April 9th may reconvey to the plaintiff an undivided one-half of what she attempted to convey to them; but it is impossible, for the purpose of maintaining this suit, to reinvest her with any supposed interest in this property on the day it was commenced.

Some question has been made in the progress of the argument in this case about the consideration or want of consideration for the conveyances of March 20th. In all of them except those of the school-district and the Raffetys, the grantees, in addition to services rendered to Stephens, are shown to be his relatives, except McAyeal, who was married to his granddaughter, and is now the husband of his grandniece. The Raffetys, besides being old friends and neighbors, had rendered him substantial aid in his financial trouble without consideration.

However, these deeds are good as voluntary conveyances against the plaintiff or others claiming under the grantor by matter subsequent as descent. They are estopped to deny or contradict the consideration mentioned in them for the purpose of destroying their effect or operation. 3 Washb. Real Prop. (5th Ed.) 400; 4 Kent, Comm. 510; *Grout* v. *Townsend*, 2 Hill, 554.

On the grounds stated, the bill must be dismissed, and it is so ordered.